STATE OF NORTH CAROLINA v. TERRY ALVIN HYATT

No. 402A00

(Filed June 28 2002)

**1. Confessions and Incriminating Statements— Miranda warnings—right to counsel—statement voluntary**

The trial court did not err in a capital first-degree murder prosecution by denying defendant's motion to suppress incriminating statements for violation of his right to counsel where, assuming that defendant was in custody, he was advised of

his Miranda rights prior to questioning. In the absence of actual coercion, the Miranda presumption that coercion exists is overcome by the recital of warnings and any voluntary statements defendant made after officers advised him of his rights were admissible.

**2. Constitutional Law— Sixth Amendment right to counsel—questioning—adversarial proceeding not instituted**

A first-degree murder defendant's Sixth Amendment right to counsel had not attached at the time of questioning where adversarial proceedings in the form of a formal charge, preliminary hearing, indictment, information, or arraignment had not been instituted against him.

**3. Constitutional Law— Fifth Amendment right to counsel—insufficient request**

A capital first-degree murder defendant did not invoke his Fifth Amendment right to counsel where defendant allegedly asked his father at the father's residence to get him an attorney but the two officers present testified that they did not hear defendant request an attorney; defendant's request while in the interrogation room to speak to his father did not invoke his Fifth Amendment right to counsel because his father was not in a position to offer him the legal assistance necessary to protect his rights; defendant's statement during interrogation that his father wanted him to have an attorney did not constitute an unambiguous request for counsel; and defendant's willingness to speak to officers unassisted by counsel after his rights were read to him, printed out for his review, and explained to him after his ambiguous utterances regarding his father's wishes constituted a waiver.

**4. Constitutional Law— right to counsel—waiver—defendant not aware of counsel's presence in police station**

A capital first-degree murder suspect knowingly waived his right to counsel even though he was kept unaware that an attorney retained for him by his father was outside the interrogation room and the State did not interfere with defendant's right to counsel by denying the lawyer's repeated requests for access to his client. The right to counsel is personal to defendant and an otherwise intelligent, knowing, and voluntary waiver is unaffected by a suspect's lack of knowledge about his or her attorney's wishes or efforts.

STATE v. HYATT

[355 N.C. 642 (2002)]

**5. Criminal Law— joinder of offenses—transactional similarity and temporal proximity**

The trial court did not err by joining two murder prosecutions where there was transactional similarity and temporal proximity in that both victims were taken to isolated areas of Buncombe County; both were robbed, raped, and killed by stabbing in the left chest; both victims were abandoned in isolated areas; and the two victims were killed four months apart.

**6. Homicide— first-degree murder—requested instruction on second-degree—denied**

The trial court properly refused a requested instruction on second-degree murder in a capital first-degree murder prosecution where the evidence was that defendant kidnapped both victims, accompanied them into the woods with a knife, and returned alone. This was sufficient to establish premeditation and deliberation and the defendant presented only his denial to negate the State's evidence.

**7. Evidence— similar crimes—motive, intent, identity, common plan**

The trial court did not err in a first-degree murder prosecution by admitting testimony from a kidnapping victim who was released and who identified defendant as her attacker where the kidnapping was similar to the charged murders, defendant's statement that he had put a lot of bodies in the river was relevant as tending to identify defendant as the murderer in the two charged crimes, and the kidnapping occurred two months after one charged murder and six months after another. Finally, the trial court guarded against the possibility of prejudice by instructing the jury to consider the kidnapping victim's testimony only for the limited purposes of motive, intent, identity, or common plan.

**8. Evidence— other crimes—joined prosecutions**

The trial court did not improperly allow evidence in one of two joined first-degree murder cases to be used as Rule 404(b) evidence in the other case where the court denied the state's request for a jury instruction allowing the evidence in each case as Rule 404(b) evidence in support of the other and specifically instructed the jury to consider the cases separately. A jury is presumed to follow the instructions given to it by the trial court.

STATE v. HYATT

[355 N.C. 642 (2002)]

**9. Evidence— testimony about lost rape kit—no bad faith**

The trial court did not err in a prosecution for two first-degree murders and other crimes which were twenty years old by admitting testimony about a rape kit which was lost prior to trial where the kit was lost during one of three moves by the Sheriff's Department in the intervening years. There was no showing of bad faith by the Sheriff's Department; an SBI serologist testified that it was unlikely that a DNA test could have been performed because there were so few sperm in the sample; defendant admitted participating in the kidnapping and robbery of the victim; and defendant had ample opportunity to cross-examine each of the State's witnesses and to impeach probativeness of the rape kit.

**10. Witnesses— speech impairment—sufficiently understandable**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by denying defendant's motion to disqualify a witness whose speech was affected by viral encephalitis where the reporter had to ask the witness to repeat himself many times, but it is clear that he was sufficiently understandable when he repeated his testimony.

**11. Appeal and Error— preservation of issues—sufficiency of evidence questions**

Only sufficiency of evidence questions properly advanced in a brief with supporting arguments and reasoning will be considered. Unsupported evidentiary challenges (specifically, bald assertions of unsupported evidence) are deemed abandoned.

**12. Rape— sufficiency of evidence—lack of consent**

There was sufficient evidence of rape where testimony that the victim feared defendant because he was carrying a knife was sufficient to show lack of consent, and evidence that she was stabbed multiple times was sufficient to establish personal injury.

**13. Witnesses— competency—bias, prior convictions and inconsistent statements**

There was sufficient evidence to support charges of first-degree murder, robbery, and kidnapping where defendant contended that the State's case relied largely on the testimony of two witnesses who should have been declared incompetent as a matter of law because of bias, prior convictions, and prior inconsistent statements. When weighing a challenge to the sufficiency of

the evidence, all evidence is to be construed in the light most favorable to the State; it is the province of the jury rather than the court to assess and determine credibility.

## 14. Homicide— conviction based on felony murder and premeditation—judgment not arrested on predicate felonies

The trial court properly denied a first-degree murder defendant's motion to arrest judgment on the predicate felonies underlying his felony murder convictions where he was also convicted based on premeditation and deliberation. The murder convictions therefore have foundations independent of the predicate felonies and the trial court could properly enter judgment on the remaining felonies.

## 15. Criminal Law— discovery—refusal to compel

Defendant suffered no prejudice where the court granted the State's request for discovery of defendant's medical, psychological and military record, but the court subsequently denied the State's motion to compel compliance with the original order.

## 16. Criminal Law— request to dismiss appointed counsel— mere request insufficient

The trial court did not err in a prosecution for first-degree murder and other crimes by denying defendant's motion to substitute appointed counsel with retained counsel 6 days into the trial where defendant argued that filing the motion is itself an adequate indicator of serious problems in the attorney-client relationship. However, the denial of such a motion has been upheld where no justifiable basis was offered for the replacement and where doing so would obstruct the orderly procedure of trial.

## 17. Constitutional Law— effective assistance of counsel—position to develop issue

A first-degree murder defendant was not in a position to adequately develop an ineffective assistance of counsel (IAC) issue concerning the failure to procure certain records to impeach witnesses, and his IAC claim was dismissed without prejudice to his right to reassert the claim during a subsequent motion for appropriate relief. Defendant could develop a second IAC claim regarding failure to rehabilitate jurors who expressed equivocal views on the death penalty, but could not direct the Supreme Court's attention toward a juror worthy of rehabilitation.

**18. Sentencing— capital—death penalty—proportionate**

A death penalty was proportionate where the record fully supports the aggravating circumstances found by the jury, there was no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration, and the case is more similar to cases in which the death penalty was found proportionate than to those in which it was found disproportionate. Defendant kidnapped and raped two women and then murdered them in cold blood by stabbing them multiple times, and the jury found two aggravating circumstances which could have supported a death sentence individually.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Downs, J., on 4 February 2000 in Superior Court, Buncombe County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. On 29 October 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 15 April 2002.

*Roy Cooper, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Michael E. Casterline for defendant-appellant.*

MARTIN, Justice.

Terry Alvin Hyatt (defendant) was indicted on 3 May 1999 for the first-degree kidnapping, robbery with a dangerous weapon, first-degree rape, and first-degree murder of Harriett Delaney Simmons occurring on or about 15 April 1979 and for the first-degree kidnapping, robbery with a dangerous weapon, first-degree rape, and first-degree murder of Betty Sue McConnell occurring on or about 25 August 1979. Defendant was tried capitally at the 10 January 2000 session of Superior Court, Buncombe County. The jury returned verdicts of guilty for each charge, with the first-degree murder verdicts based on malice, premeditation, and deliberation and under the felony murder rule. At the conclusion of the capital sentencing proceeding, the jury recommended a sentence of death for the murder of Simmons and a sentence of death for the murder of McConnell, and the trial court entered judgment in accordance with these recommendations. The trial court also sentenced defendant to six consecutive terms of life imprisonment for the noncapital felony convictions.

The state's evidence presented at trial, as relevant to defendant's assignments of error, tended to show the following: At 1:00 a.m. on 14 April 1979, Simmons left her job in Raleigh and started driving to Nashville, Tennessee, to visit a friend. Simmons told her family that she expected to arrive in Nashville by 7:00 or 8:00 a.m. When she had not called by 10:30 a.m. the next day, her family called the residence of Simmons' friend in Tennessee and discovered that she had never arrived. They then notified the police that Simmons was missing.

On 20 April 1979, Ronald Wayne Dement, a family friend, decided to drive along the route he believed Simmons would have driven to Nashville. Dement found Simmons' car at a rest stop on Interstate 40 west of Statesville and observed that her suitcase and thermos were inside the car but that her keys and purse were missing. Following a search, Simmons could not be located in the area around the rest stop.

Almost one year after Simmons disappeared, the Buncombe County Sheriff's Department received a report that a skull and skeleton were spotted in a wooded area at the edge of the Pisgah National Forest near Highway 151 in Candler, North Carolina. A search of the area produced bones, clothing, jewelry, a set of car keys, other personal effects, and a short segment of silver duct tape. The personal items found were identified as belonging to Simmons. Billy Matthews, State Bureau of Investigation (SBI) Special Agent, matched the keys recovered at the scene to the number on the sales order made out to Simmons at the Toyota dealership where she purchased her car. Using dental records, the remains were positively identified as those of Simmons. An autopsy and examination of the skeletal remains revealed that death was caused by multiple stab wounds to the left chest made with a knife or knife-like object that would have penetrated the heart, lungs, or other vital organs.

The state's evidence regarding the McConnell case tended to show that around 11:30 p.m. on 24 August 1979, McConnell telephoned her mother from work to let her know she was meeting a friend at a local bowling alley in Asheville. During the early morning hours of 25 August 1979, Don and Sue Helms looked out the window of their home along the French Broad River in Asheville and saw a woman later identified as McConnell lying in a driveway. The woman had multiple stab wounds to her chest, extending from below her neck to her stomach.

When she was discovered by the Helmses, McConnell's body was soaking wet, her chest was covered with blood, her skin was very white, and she was gasping for air. Before she died, McConnell made two statements to the Helmses: "I was stabbed and thrown into the river," and "I was picked up at work by two guys." McConnell's sunglasses were found on the bank of the river, and law enforcement officers found bloodstains in an area of grass, with a trail of blood leading from the river to the point where McConnell was found in the Helmses' driveway, approximately fifty feet from the river. McConnell's car was located upstream, submerged in the river, with a scrape on its side and the driver's window rolled down. An autopsy showed five stab wounds to McConnell's left chest. A wound below the collarbone went through the upper lobe of the lung and perforated the pulmonary artery, causing McConnell's death. The autopsy also revealed the presence of a cloudy material in the vaginal vault, later identified as sperm, which was collected with other rape kit evidence and sent to the SBI lab on 31 August 1979.

On 13 August 1998, Jerry Harmon visited Captain Pat Hefner at the Buncombe County Sheriff's Department. Harmon, who was intoxicated at the time and was a self-proclaimed heavy drinker, informed Captain Hefner that he had information that he wanted to get off his mind. Harmon described to officers the rape and murder of McConnell by defendant. Harmon related that on 24 August 1979, he and defendant "drank all day and—and just rode around and partied." Sometime between 10:00 p.m. and midnight, as defendant and Harmon were driving, defendant pulled the truck beside a car stopped at a traffic light and gestured obscenely to the woman driving the car next to them. When the woman drove off after the light changed, defendant positioned his truck behind the woman's car and drove into its back bumper, forcing it off the road.

Defendant ran to the woman's car, opened the door, pushed the woman into the passenger seat, yelled to Harmon to follow him, and drove off. Harmon followed defendant until he pulled off the road in an isolated wooded area. Defendant exited the car with the woman, holding a knife on her, and took her to the back of the truck Harmon was driving. Defendant told her that they would not hurt her but that they were going to have sex with her and let her go. Defendant proceeded to rape the woman while Harmon watched from outside the truck.

Defendant forced McConnell back into her car and drove to an isolated location adjacent to the French Broad River with Harmon

following in the truck. Defendant took McConnell down to the river and out of Harmon's sight, but Harmon could hear McConnell screaming. Defendant returned to the truck and told Harmon he had stabbed McConnell and thrown her into the river. Harmon followed defendant, who was driving McConnell's car, to another location upstream, where defendant disposed of the car by driving it into the river.

At the time of Harmon's meeting with Captain Hefner, Harmon also informed officers that Dean Helms, a mutual friend of defendant and Harmon, knew about the McConnell murder. In October 1998, R. Timothy Shook, an SBI Agent who focused on unsolved murders, and Detective Anne Benjamin of the Buncombe County Sheriff's Department questioned Helms at his home about the kidnapping. Helms said he was glad to see the officers and had been praying about it. Helms thereafter began describing how he and defendant had kidnapped a woman from a rest area twenty years previously during a drive from Greensboro to Asheville. Agent Shook recognized the details of this account as being very similar to the unsolved murder of Simmons.

At trial, Helms testified that while he and defendant were returning from a beach trip in 1979, they encountered a woman with car trouble at a rest stop. Defendant told the woman they could help by driving her to get a part that would fix her car. Helms testified that the woman got into their van, but later stated that defendant "took her unwillingly." They drove up a mountain outside of Candler, North Carolina, and stopped on a dirt road, where defendant had sex with the woman in the back of the van. Helms testified that defendant did not rape the woman because "she was willing" but that she was scared of both of them because defendant was carrying a knife.

Defendant then took the woman into the woods while Helms remained in the van. Helms heard the woman screaming. After approximately thirty minutes, Helms saw defendant emerge from the woods alone, with blood on the bottom of his shirt. Defendant told Helms that the woman had "took off walking." The two men drove back down the mountain and threw the woman's purse out as they drove.

Defendant presented no evidence during the guilt phase of the trial. Additional facts are provided as necessary below in addressing defendant's arguments.

Defendant first argues that the trial court erred by failing to grant his motion to suppress incriminating statements made to SBI Agent Shook and Detective Benjamin on 19 November 1998. The two officers questioned defendant at his residence in Asheville based on the information they learned from Harmon and Dean Helms. Agent Shook and Detective Benjamin identified themselves as law enforcement officers and informed defendant they wanted to ask him about the death of Amber Lundgren, a homicide victim whose death occurred in early 1998. Defendant was willing to cooperate and volunteered to have blood drawn for DNA analysis at the Buncombe County Health Department. Defendant also reluctantly agreed to have his truck photographed for a vehicle lineup.

Defendant drove himself to the facility in his truck along with Agent Shook, while Detective Benjamin followed in an unmarked patrol car. After the procedure, the officers invited defendant to the Sheriff's Department for questioning. At the Sheriff's Department, defendant was taken to an interview room where Agent Shook informed him that he wanted to discuss the 1979 abduction, rape, and death of McConnell. Defendant became silent and did not talk for some time. Agent Shook showed defendant what he said were defendant's fingerprints on a type of bond paper. Defendant studied the papers for a few moments and eventually stated he was ready to talk to the officers, but he wanted to see his father first.

At that time, the officers read the North Carolina SBI "Interrogation Advisement of Rights" form to defendant. Defendant also read this form and agreed to sign it after Agent Shook wrote on it, "wish to talk to father, James F. Hyatt, first and then give statement." The form advised defendant: (1) that he had the right to remain silent and that anything he said could be used against him in court; (2) that defendant had the right to talk to a lawyer for advice before questioning and to have a lawyer present during questioning; (3) that if he was unable to afford a lawyer, one would be appointed to him before questioning; and (4) that if he chose to answer questions without a lawyer, he would retain the right to stop the questioning at any time and that he could stop the questioning until he consulted with a lawyer. Prior to signing the form, the officers read the following statement on the form to defendant:

I have read the statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know

what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Defendant was then handcuffed and transported to his father's residence. Agent Shook and Captain Hefner stood ten to twelve feet away, but they overheard defendant whisper to his father that he was in trouble because of something that occurred a long time ago when he used to spend time with Dean Helms. There is conflicting testimony as to whether defendant's father advised defendant that he should have a lawyer and that he would help defendant retain one, or whether defendant initiated the discussion about retaining a lawyer. The state's evidence was uncontroverted, however, that neither Agent Shook nor Detective Benjamin heard defendant request an attorney while at his father's residence.

Upon returning to the interrogation room at approximately 1:10 p.m., the officers continued to question defendant about the McConnell case, and defendant stated that his father wanted to retain a lawyer for him. Detective Benjamin asked defendant if that was defendant's wish as well and explained that defendant was the one being interviewed. Detective Benjamin reminded defendant that invoking his right to counsel was his decision, not his father's. Defendant responded, "that is what my daddy wants me to do." Defendant then asked to go to the rest room, where he was accompanied by Agent Shook. When they returned, defendant again requested to speak to his father, but Agent Shook replied that he had already been given that opportunity.

Defendant proceeded to describe his involvement in the McConnell case, saying that he did not kill McConnell but that Harmon was the murderer. Defendant described how he and Harmon were riding together and how Harmon got into McConnell's car and drove to the river, where Harmon raped and killed McConnell. Defendant admitted taking McConnell's belongings from her car. At the conclusion of the questioning, Agent Shook read his notes to defendant, and defendant agreed that the information was correct. Agent Shook then told defendant that he wanted to talk about the Simmons case, and defendant was silent for a long time. Defendant stated he was through talking, at which time the interview was concluded, and defendant was placed under arrest.

At the suppression hearing on 10 January 2000, defendant called his father, James Hyatt, who testified he retained counsel for defend-

ant. He stated that he and counsel arrived at the Sheriff's Department around 3:00 p.m. on 19 November 1998 but that they were not permitted to see defendant until 6:00 p.m. Although counsel testified that he made numerous requests that all questioning be stopped until he could talk to defendant, the officers informed him that defendant had not invoked his right to counsel.

The trial court denied defendant's motion to suppress, finding that defendant had been advised of and understood his rights, had signed the waiver form, and had not requested an attorney. Rather, defendant told officers that his father wanted him to have an attorney. The trial court concluded that, as a matter of law, defendant waived his rights and that his statements were understandingly, voluntarily, and knowingly made.

At the outset, we note that the trial court's findings of fact following a hearing on the admissibility of defendant's statements are binding on this Court and conclusive on appeal if supported by competent evidence, even if that evidence is conflicting. *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995); *State v. Barber*, 335 N.C. 120, 129, 436 S.E.2d 106, 111 (1993), *cert. denied*, 512 U.S. 1239, 129 L. Ed. 2d 865 (1994); *State v. Davis*, 305 N.C. 400, 410, 290 S.E.2d 574, 581 (1982); *State v. Jenkins*, 292 N.C. 179, 184-85, 232 S.E.2d 648, 652 (1977). A thorough review of the transcript and record in the present case reveals there was ample, competent evidence to support the trial court's findings of fact.

[1] The trial court's conclusions of law, however, are reviewable *de novo*. *See Barber*, 335 N.C. at 129, 436 S.E.2d at 111 (while trial court's supported findings of fact are binding on an appellate court, conclusions of law are fully reviewable on appeal). First, defendant contends that the trial court erred by failing to conclude as a matter of law that his statements should have been suppressed because he was in the custody of the Sheriff's Department and thus had a right to counsel. Defendant's argument, however, illuminates his misconception of the nature of the protections against compelled self-incrimination afforded by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and its progeny.

The United States Supreme Court, in *Miranda*, recognized "the danger of coercion [that] results from the interaction of custody and official interrogation," *Illinois v. Perkins*, 496 U.S. 292,

297, 110 L. Ed. 2d 243, 251 (1990), that threatens to " 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination," *Rhode Island v. Innis*, 446 U.S. 291, 299, 64 L. Ed. 2d 297, 306 (1980) (quoting *Miranda*, 384 U.S. at 457, 16 L. Ed. 2d at 714). The *Miranda* warnings shield a suspect from "inherently compelling" custodial interrogation by advising him or her of specific rights, namely: (1) that the individual has the right to remain silent; (2) that as a consequence of foregoing the right to remain silent, anything the individual says may be used in court against the individual; (3) that the individual has the right to consult with an attorney in order to determine how best to exercise his or her rights prior to being questioned; and (4) that if the individual cannot afford an attorney, one will be appointed. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07. In the absence of actual coercion, the presumption created by *Miranda*—that coercion exists if a suspect is not advised of his or her rights before being questioned while in custody—is overcome by the recital of warnings. *State v. Buchanan*, 353 N.C. 332, 336-37, 543 S.E.2d 823, 826 (2001) (citing *Oregon v. Elstad*, 470 U.S. 298, 306-07, 84 L. Ed. 2d 222, 230-31 (1985)).

Defendant's assertion that his right to counsel was violated is misplaced. Even assuming, without deciding, that defendant was in custody, he was advised of his *Miranda* rights prior to questioning. Moreover, the officers advised defendant of his rights at the moment defendant indicated a willingness to discuss his knowledge of the 1979 abduction, rape, and death of McConnell. Therefore, any voluntary statements defendant made thereafter are admissible in court.[1] *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706-07.

---

**[2]** 1. Furthermore, to the extent defendant's argument can be construed to suggest that his Sixth Amendment right to counsel attached at the time of questioning, this argument fails because "[i]t is only when the defendant finds himself confronted with the prosecutorial resources of the state arrayed against him and immersed in the complexities of a formal criminal prosecution that the sixth amendment right to counsel is . triggered as a guarantee." *State v. McDowell*, 301 N.C. 279, 289, 271 S.E.2d 286, 293 (1980), *cert. denied*, 450 U.S. 1025, 68 L. Ed. 2d 220 (1981). Here, defendant's Sixth Amendment right to counsel had not ripened at the time of questioning because adversarial judicial proceedings, in the form of a " 'formal charge, preliminary hearing, indictment, information, or arraignment,' " had not been instituted against him. *State v. Franklin*, 308 N.C. 682, 689, 304 S.E.2d 579, 583 (1983) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417 (1972)), *overruled on other grounds by, State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985); *see generally United States v. Gouveia*, 467 U.S. 180, 187-89, 81 L. Ed. 2d 146, 153-55 (1984).

**[3]** Defendant also asserts that he invoked his Fifth Amendment right to counsel by asking his father to retain a lawyer for him. Defendant contends that this request was overheard by Agent Shook and Detective Benjamin, who accompanied defendant to his father's house. Defendant argues that his affirmative invocation of counsel was made apparent when an attorney retained by his father arrived at the Sheriff's Department. Defendant further argues that he invoked his Fifth Amendment right to counsel when he told Agent Shook that his father wanted him to have a lawyer. Defendant alleges that by denying his second request to meet with his father, the officers effectively denied him access to the attorney retained by his father. These arguments are without merit.

If a criminal suspect invokes his right to counsel at any time during custodial interrogation, the interrogation must cease, and it cannot be resumed in the absence of an attorney unless the defendant initiates further discussion with the officers. *State v. Jackson,* 348 N.C. 52, 55, 497 S.E.2d 409, 411, *cert. denied,* 525 U.S. 943, 142 L. Ed. 2d 301 (1998), *overruled on other grounds by Buchanan,* 353 N.C. at 340, 543 S.E.2d at 828. In *Davis v. United States,* 512 U.S. 452, 129 L. Ed. 2d 362 (1994), the United States Supreme Court held that to invoke his or her right to counsel, "the suspect must unambiguously request counsel." *Id.* at 459, 129 L. Ed. 2d at 371. The invocation of the right to counsel " 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Id.* (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178, 115 L. Ed. 2d 158, 169 (1991)). The test is an objective one that assesses whether a reasonable officer under the circumstances would have understood the statement to be a request for an attorney. *See Jackson,* 348 N.C. at 56, 497 S.E.2d at 411 (citing *Davis,* 512 U.S. at 459, 129 L. Ed. 2d at 371). Unless the in-custody suspect "actually requests" an attorney, lawful questioning may continue. *Davis,* 512 U.S. at 462, 129 L. Ed. 2d at 373.

In the instant case, even if we assume, without deciding, that defendant was in custody, defendant never sufficiently articulated his desire for counsel, either at his home or in the interrogation room, so that a reasonable officer under the circumstances would have understood the statement to be a request for an attorney. Defendant's father testified that Agent Shook was standing nearby when defendant whispered to his father, "I want you to get me a lawyer," and that the officer "could have heard it." Cindy L. Spalding, defendant's girlfriend, testified that she heard defendant ask his father to "get him an attor-

ney" and also that she approached Captain Hefner's vehicle where defendant sat in the front passenger seat when defendant asked her "to make sure that his dad got him a lawyer." Although Agent Shook and Detective Benjamin accompanied defendant, they both repeatedly testified that they did not hear defendant request an attorney at any time.

It is axiomatic that, as a threshold issue to assessing whether a reasonable officer under the circumstances would have understood a statement made by a suspect to be a request for an attorney, the statement must at least be perceived by the accompanying officer. *See id.* at 459, 129 L. Ed. 2d at 371. In the instant case, as found by the trial court, neither Agent Shook nor Detective Benjamin heard defendant's alleged invocation of his right to counsel. We therefore need not assess whether such statements could reasonably be construed as an expression of a desire for the assistance of counsel.

With respect to defendant's statements during interrogation to the effect that his father wanted him to have an attorney present and his second request to speak to his father, such statements do not, as a matter of law, constitute an unambiguous request for counsel. *See id.* at 461-62, 129 L. Ed. 2d at 373. In *Fare v. Michael C.*, 442 U.S. 707, 61 L. Ed. 2d 197 (1979), the United States Supreme Court rejected the contention that a juvenile's request to speak with his probation officer served to invoke his *Miranda* rights. *Id.* at 724, 61 L. Ed. 2d at 212. The rule in *Miranda* that a request for an attorney is *per se* an invocation of one's Fifth Amendment rights is based on the unique role attorneys play in our society as the protectors of legal rights in dealing with the police and the courts. *Id.* at 719, 61 L. Ed. 2d at 208-09. In declining to equate a request to speak with a probation officer, a clergyman, or a close friend as an invocation of one's Fifth Amendment rights, the Court in *Michael C.* recognized the role those trained as attorneys play in the adversary system of criminal justice and promoted lawyers as uniquely qualified to alleviate the concerns embodied in *Miranda*, namely, the danger of coercion resulting from the interaction of custody and official interrogation. *Id.* Likewise, in the instant case, defendant cannot claim to have invoked his Fifth Amendment right to counsel by asking to speak to his father because his father was not in a position to offer the type of legal assistance necessary to protect defendant's rights during custodial interrogation. *See id.*

Additionally, defendant's statement to the effect that his *father* wanted him to have a lawyer present during the interrogation was

insufficient to constitute an invocation of defendant's Fifth Amendment right to counsel. This statement did not unambiguously convey *defendant's* desire to receive the assistance of counsel. Moreover, when defendant conveyed his father's wish that he get an attorney, Detective Benjamin made no attempt to dissuade defendant from exercising his Fifth Amendment right. Rather, she clarified that defendant, and not his father, must be the one to decide whether to seek the assistance of counsel. *See Davis*, 512 U.S. at 461-62, 129 L. Ed. 2d at 373 (emphasizing that, in light of a suspect's ambiguous or equivocal statement, good police practice may necessitate clarification of whether the suspect desires an attorney, but nonetheless declining to adopt a constitutional rule requiring such clarification). Defendant's willingness to speak to Detective Benjamin and Agent Shook unassisted by counsel after having his *Miranda* rights read to him, printed out for his review, and explained to him upon his ambiguous utterances regarding his father's wishes constituted a waiver of defendant's Fifth Amendment rights. " '[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process,' " *id.* at 460, 129 L. Ed. 2d at 372 (quoting *Moran v. Burbine*, 475 U.S. 412, 427, 89 L. Ed. 2d 410, 424-25 (1986)), and "[a] suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted, *id.* at 460-61, 129 L. Ed. at 372.

[4] Next, defendant alleges that there cannot be a knowing waiver of one's right to counsel where a suspect is kept unaware of his lawyer's presence outside the interrogation room and, furthermore, that by denying his attorney's repeated requests for access to his client, the state interfered with defendant's right to counsel.

In *Burbine*, the United States Supreme Court considered the same argument made by defendant in the instant case: that a state's refusal to inform the defendant of his attorney's attempts to reach him undermines the validity of a defendant's otherwise proper waiver. 475 U.S. at 420, 89 L. Ed. 2d at 420. The Court rejected this argument: "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 422, 89 L. Ed. 2d at 421.

The Court reasoned that requiring police to inform a suspect of his lawyer's efforts to contact him would constitute an unnecessary

handicap on otherwise permissible investigatory efforts and would upset the subtle balance, embodied in *Miranda*, between the legitimate and substantial interest of the public in securing admissions of guilt and the protection of a suspect in the inherently coercive environment of custodial interrogation. *Id.* at 426-27, 89 L. Ed. 2d at 424-25. Rather than requiring police to keep a suspect abreast of the status of his legal representation, the Court held as follows:

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 422-23, 89 L. Ed. 2d at 422. This Court has followed *Burbine* for over fifteen years as the controlling law under the federal and state Constitutions and has held that an otherwise intelligent, knowing, and voluntary waiver of Fifth Amendment rights is unaffected by a suspect's lack of knowledge about his or her attorney's wishes or efforts. *See State v. Reese*, 319 N.C. 110, 130-32, 353 S.E.2d 352, 363-64 (1987); *see also State v. Peterson*, 344 N.C. 172, 178-79, 472 S.E.2d 730, 733-34 (1996) (reiterating that because right to counsel is personal to a defendant, a decision to speak to officers and waive Fifth Amendment rights was voluntarily, knowingly, and intelligently made even if attorney demanded that he be present during any interrogation and advised the officers not to talk to his client). Defendant's argument is without merit.

[5] Defendant next argues that the trial court's joinder of the Simmons and McConnell cases substantially prejudiced his right to a fair trial. Following a pretrial hearing on the state's motion for joinder, the trial court found the common *modus operandi* and temporal proximity of the Simmons and McConnell cases sufficient to support joinder. Defendant argues that any "surface similarities" between the Simmons and McConnell murders are far outweighed by their differences. We disagree.

Joinder is proper under N.C.G.S. § 15A-926(a) if there is a transactional connection between the separate criminal offenses. N.C.G.S. § 15A-926(a) (2001); *State v. Moses*, 350 N.C. 741, 750, 517 S.E.2d 853, 860 (1999), *cert. denied*, 528 U.S. 1124, 145 L. Ed. 2d 826 (2000). The trial court must also consider if joinder of the offenses would hinder the defendant's ability to present a defense ·or deprive the

accused of a fair trial. *State v. Greene*, 294 N.C. 418, 421-22, 241 S.E.2d 662, 664 (1978).

While the question of whether consolidated offenses are transactionally related is fully reviewable on appeal, *State v. Chapman*, 342 N.C. 330, 343, 464 S.E.2d 661, 668 (1995), *cert. denied*, 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996), we will not disturb the trial court's decision absent an abuse of discretion, *State v. Weathers*, 339 N.C. 441, 447, 451 S.E.2d 266, 269 (1994). In *Chapman*, we stated that a transactional connection could be established by demonstrating a common *modus operandi* in the commission of the separate crimes, as well as by the existence of a temporal proximity between the offenses. *Chapman*, 342 N.C. at 343, 464 S.E.2d at 668. Here, substantial similarities between the offenses demonstrate the existence of a transactional connection: both victims were females traveling alone on public roads; both victims were taken to isolated areas of Buncombe County; both were robbed, raped, and killed by stabbing in the left chest area; and both victims were abandoned in isolated areas. In addition, temporal proximity is established by the fact that the two victims were killed four months apart.

Although defendant argues that joinder in this case was unfairly prejudicial, he makes no showing of prejudice in his brief to support his assertion, and he has therefore abandoned this issue on appeal. *See* N.C. R. App. P. 10(b)(1), 28(b)(6). Furthermore, because the facts amply establish the existence of a transactional connection, we leave undisturbed the decision of the trial court to consolidate the offenses.

**[6]** Defendant next argues the trial court erred in denying his request for an instruction on second-degree murder. Defendant asserts that because reasonable doubt existed on the issue of whether defendant premeditated and deliberated the Simmons and McConnell homicides, the trial court must instruct on the lesser-included offense of second-degree murder. We find no merit in defendant's argument.

We have stated the rule for determining whether an instruction for the lesser-included offense of second-degree murder is required as follows:

[I]f the State's evidence is sufficient to satisfy its burden of proving each element of first-degree murder, including premeditation and deliberation, and there is no evidence other than defendant's denial that he committed the crime to negate these

elements, the trial court should not instruct the jury on second-degree murder.

*State v. Conaway*, 339 N.C. 487, 514, 453 S.E.2d 824, 841, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995); *see also State v. Leazer*, 353 N.C. 234, 237, 539 S.E.2d 922, 925 (2000).

The state's evidence showed that defendant kidnapped both victims, accompanied both victims into the woods with a knife, and returned alone. This evidence was sufficient to establish that the multiple-stabbing deaths of McConnell and Simmons were committed by defendant with premeditation and deliberation. Defendant presented no evidence to negate the state's evidence other than his denial of guilt. Because there was no evidence upon which the jury could find defendant guilty of second-degree murder and because defendant did not negate any of the elements of first-degree murder, including the elements of premeditation and deliberation, there was no basis upon which the trial court could submit an instruction on second-degree murder. Thus, the trial court properly refused to submit defendant's requested instruction.

**[7]** In his next argument, defendant argues the trial court erred in admitting the testimony of Carolyn Brigmon under N.C.G.S. § 8C-1, Rule 404(b). During *voir dire* on 25 January 2000, Brigmon testified that she was kidnapped by defendant at knifepoint as she was walking home from work at 4:00 a.m. on 19 October 1979. Brigmon stated that defendant threw her into his truck and took her to a remote area. She said that as they drove, defendant kept a knife by his side and repeatedly ran his finger over the blade. Brigmon testified that although defendant told her to take her clothes off, she convinced him not to rape her. He told her, "I'm going to do something I've never done before. I'm going to give you back your life." He also said, as they were crossing a bridge over the river, that he "had put a lot of bodies in there" and that he would do the same to her if she told anyone. Defendant robbed her of forty-four dollars and threw her purse out the window. Brigmon went to the police immediately and identified defendant as her attacker. Defendant was charged with armed robbery and kidnapping, and he subsequently pled guilty.

The trial court permitted Brigmon to take the stand and admitted her testimony as evidence of motive, intent, plan, and identity under Rule 404(b). Defendant argues that the prior crime involving Brigmon was so remote in time and so dissimilar that any probative

value was substantially outweighed by the prejudice visited on defendant. Defendant's argument is without merit.

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2001). Rule 404(b) is a "rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

To admit evidence of defendant's prior crimes or bad acts under Rule 404(b), there must be " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both crimes.' " *State v. Riddick*, 316 N.C. 127, 133, 340 S.E.2d 422, 426 (1986) (quoting *State v. Moore*, 309 N.C. 102, 106, 305 S.E.2d 542, 545 (1983)). For example, we have held that an unrelated prior assault was properly admitted to prove identity of the defendant as the murderer where each of the defendant's victims was taken by surprise, confined in the trunk of a car, forced to strip, robbed, and shot in the head. *State v. Lemons*, 348 N.C. 335, 352, 501 S.E.2d 309, 320 (1998), *sentence vacated on other grounds*, 527 U.S. 1018, 144 L. Ed. 2d 768 (1999).

In the instant case, the kidnapping, threatening, and robbing of Brigmon was particularly similar to the Simmons and McConnell cases. These actions tend to indicate that the same person committed the crimes charged. In each of the three cases, the perpetrator captured lone females, took them to isolated locations in Buncombe County, and committed or attempted to commit the same crimes against them by using or threatening to use a knife. Additionally, defendant's statement that he had put a lot of bodies into the river was relevant in tending to identify defendant as the murderer of Simmons and McConnell.

Defendant's argument that the offenses against Brigmon were too remote to be relevant is unavailing. The case involving Brigmon

occurred two months after the McConnell murder and six months after the Simmons murder. In *State v. Carter*, 338 N.C. 569, 451 S.E.2d 157 (1994), *cert. denied*, 515 U.S. 1107, 132 L. Ed. 2d 263 (1995), we upheld the use, under Rule 404(b), of an assault committed by the defendant eight years prior to the offense for which he was being tried because both offenses were committed in a particularly similar manner—a blow below the right eye with a brick-like object. *Id.* at 588-89, 451 S.E.2d at 167. In *State v. Hipps*, 348 N.C. 377, 501 S.E.2d 625 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999), we upheld the use, under Rule 404(b), of a murder committed seventeen years prior to the murder for which the defendant was being tried because the knife wounds and head trauma were sufficiently similar. *Id.* at 404-05, 501 S.E.2d at 641-42. The trial court properly admitted evidence of the Brigmon case pursuant to Rule 404(b).

By arguing the admission of Brigmon's testimony generates a great danger of unfair prejudice to him, defendant appears to assert that even if the testimony is admissible under Rule 404(b), the evidence of the offenses against Brigmon should have been excluded under Rule 403 of the North Carolina Rules of Evidence. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (2001). The exclusion of evidence under Rule 403 is a matter generally left to the sound discretion of the trial court, *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986), which we leave undisturbed unless the trial court's ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision," *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Here, the trial court did not abuse its discretion by admitting evidence of bad acts otherwise admissible under Rule 404(b). Rather, the trial court guarded against the possibility of prejudice by instructing the jury to consider Brigmon's testimony only for the limited purposes of motive, intent, identity, or common plan. The trial court specifically admonished the jury not to consider Brigmon's testimony on the issue of defendant's character. *See, e.g., Lemons*, 348 N.C. at 352-53, 501 S.E.2d at 320 (prior misconduct admissible and not unfairly prejudicial under Rule 403 where trial court gave limiting instruction regarding permissible uses of 404(b) evidence). Defendant's argument is rejected.

[8] By his next argument, defendant asserts that the trial court committed prejudicial error in allowing evidence in the Simmons case to

be used as Rule 404(b) evidence in the McConnell case, and vice versa. During the charge conference, the state requested a jury instruction allowing the evidence in each case as Rule 404(b) evidence in support of the other. The trial court denied the state's request. Furthermore, the trial court specifically instructed the jury to consider the Simmons case and the McConnell case separately. We have long held that a jury is presumed to follow the instructions given to it by the trial court. *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Defendant's contentions are rejected.

**[9]** Defendant next argues that the trial court erred by admitting testimony regarding a rape kit that was unavailable to defendant because it was lost prior to trial. Laboratory tests of the rape kit evidence, collected during an examination of McConnell by SBI serologist Brenda Bissette on 31 August 1979, revealed the presence of sperm. The rape kit was lost, however, during one of three moves by the Sheriff's Department in the past twenty years. Although defendant concedes the rape kit establishes the presence of sperm, he argues that the evidence should be excluded because no tests were conducted to determine whether the sperm found matched his DNA. Defendant argues that the evidence should have been excluded under Rule 403 as unfairly prejudicial, confusing, and misleading. Defendant also argues that he was denied the opportunity to examine a potentially significant piece of exculpatory evidence.

We have upheld the admission of evidence subsequently lost or destroyed where the exculpatory value of tests a defendant seeks to perform on that evidence is speculative and there is no showing of bad faith or willful intent on the part of any law enforcement officer. *See State v. Hunt*, 345 N.C. 720, 724-25, 483 S.E.2d 417, 420-21 (1997); *State v. Mlo*, 335 N.C. 353, 373, 440 S.E.2d 98, 108, *cert. denied*, 512 U.S. 1224, 129 L. Ed. 2d 841 (1994). In the instant case, Bissette testified to the speculative nature of the DNA examination sought by defendant, stating that it was highly unlikely that a DNA test could be performed because so few sperm were present in the sample. Furthermore, defendant presents no argument and makes no showing of bad faith or willful intent on the part of the Sheriff's Department. Finally, as stated above, we entrust the matter of exclusion of evidence under Rule 403 to the sound discretion of the trial court unless the decision was arbitrarily made or manifestly unsupported by reason. *Syriani*, 333 N.C. at 379, 428 S.E.2d at 133. Here, defendant

admitted participating in the kidnapping and robbery of McConnell; thus, we cannot say the trial court's decision was unsupported or arbitrary. We further note defendant had ample opportunity to cross-examine each of the state's witnesses and to otherwise impeach the probativeness of the rape kit evidence. This argument is rejected.

[10] Defendant next argues that the trial court erred by denying defendant's motion to disqualify Dean Helms as a witness on the grounds that he was unintelligible and incapable of being cross-examined. At trial, Helms testified that he suffered from viral encephalitis, a motor disease that affected his speech.

The obligation of the trial court to make a preliminary competency determination is embodied in Rules 104(a) and 601 of the North Carolina Rules of Evidence, whereby the trial court may disqualify a witness when the trial court determines he is "incapable of expressing himself concerning the matter as to be understood, either directly or through interpretation, by one who can understand him." N.C.G.S. § 8C-1, Rules 104(a), 601 (2001). Absent a showing that the trial court's ruling on a challenge to the competency of a witness could not have been the result of a reasoned decision, we must leave the ruling undisturbed. *State v. Hicks*, 319 N.C. 84, 89, 352 S.E.2d 424, 426 (1987). While we acknowledge the court reporter had to ask Helms to repeat himself many times, it is clear from our review of the transcript that Helms was sufficiently audible and understandable when he repeated his testimony. Thus, we cannot say that the trial court abused its discretion in permitting Helms to testify as a competent witness.

[11] Defendant next argues the trial court erred in denying defendant's motion to dismiss the charges of first-degree rape, robbery with a dangerous weapon, first-degree kidnapping, and first-degree murder in both the Simmons and McConnell cases because of the insufficiency of the evidence. In addressing the sufficiency of the evidence, we consider only those errors defendant properly advances in his brief with supporting arguments and reasoning, and deem abandoned any unsupported evidentiary challenges, namely those in which defendant baldly asserts insufficient evidence. N.C. R. App. P. 28(b)(6); *see also State v. Lloyd*, 354 N.C. 76, 87, 552 S.E.2d 596, 607 (2001).

We recently reiterated the long-standing rule governing motions to dismiss as follows:

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion. *State v. Frogge*, 351 N.C. 576, 584, 528 S.E.2d 893, 899, *cert. denied*, 531 U.S. 994, 148 L. Ed. 2d 459 (2000). As to whether substantial evidence exists, the question for the trial court is not one of weight, but of the sufficiency of the evidence. *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001). In resolving this question, the trial court must examine the evidence in the light most advantageous to the State, drawing all reasonable inferences from the evidence in favor of the State's case. *Id.* Moreover, "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988); *see also Frogge*, 351 N.C. at 585, 528 S.E.2d at 899.

*State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002).

**[12]** Defendant specifically challenges the rape charge in the Simmons case on the grounds that the state did not prove lack of consent. In order for the jury to convict a defendant of first-degree rape, the state must demonstrate that a defendant engaged in vaginal intercourse by force and against the victim's will and either: (1) employed or displayed a dangerous or deadly weapon or an article reasonably believed to be a dangerous or deadly weapon, (2) inflicted serious personal injury, or (3) committed the offense aided and abetted by one or more other persons. N.C.G.S. § 14-27.2(a)(2) (2001).

The testimony of Dean Helms and the circumstantial evidence were sufficient to prove defendant committed the first-degree rape of Simmons. Helms testified that Simmons feared defendant because defendant was carrying a knife. This testimony was sufficient to show lack of consent. *See State v. Alston*, 310 N.C. 399, 407, 312 S.E.2d 470, 475 (1984) (consent induced by fear of violence is not legal consent). Additionally, the evidence that Simmons was stabbed multiple times is sufficient to establish the personal injury element of first-degree rape. *See State v. Herring*, 322 N.C. 733, 739, 370 S.E.2d 363, 367-68 (1988).

**[13]** Defendant next addresses the sufficiency of the evidence supporting the charges of first-degree murder, robbery with a dangerous

weapon, and first-degree kidnapping of Simmons, as well as each of the charges against defendant in the McConnell case. Defendant contends that the state's case relied largely on the testimony of Dean Helms and Jerry Harmon and that the charges should be dismissed because neither witness was credible as a matter of law. Defendant notes that both witnesses were felons with significant criminal histories, their respective accounts of the events at trial conflicted with earlier statements to police, and their respective statements were self-serving. In essence, defendant proposes that where a witness is impeached with evidence of bias, prior convictions, or prior inconsistent statements, this Court must declare that witness incompetent as a matter of law. This argument ignores the fact that when weighing a challenge to the sufficiency of the evidence, we are to construe all evidence in the light most favorable to the state. *State v. Alexander*, 337 N.C. 182, 187, 446 S.E.2d 83, 86 (1994). Defendant's proposition would occasion the fall of a long-standing principle in our jurisprudence that we are unprepared to abandon: that it is the province of the jury, not the court, to assess and determine witness credibility. *State v. Parker*, 354 N.C. 268, 278, 553 S.E.2d 885, 894 (2001), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3741 (2002); *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991); *State v. Orr*, 260 N.C. 177, 179, 132 S.E.2d 334, 336 (1963); *State v. Wood*, 235 N.C. 636, 637-38, 70 S.E.2d 665, 667 (1952); *State v. Bowman*, 232 N.C. 374, 376, 61 S.E.2d 107, 108-09 (1950); *State v. McLeod*, 196 N.C. 542, 545, 146 S.E. 409, 410 (1929).

**[14]** In his next argument, defendant alleges the trial court erred in failing to arrest judgment on the predicate felonies underlying defendant's felony murder convictions. Because defendant was also convicted of the murders based on premeditation and deliberation, the murder convictions have foundations independent of the predicate felonies. *See State v. Burgess*, 345 N.C. 372, 382, 480 S.E.2d 638, 643 (1997); *State v. Prevette*, 317 N.C. 148, 155-56, 345 S.E.2d 159, 164 (1986); *see also State v. Goodman*, 298 N.C. 1, 20, 257 S.E.2d 569, 582 (1979) (where the defendant was found guilty of murder on basis of premeditation and deliberation, other felonies do not merge with the murder conviction). The trial court could therefore properly enter judgment on the remaining felonies. The trial court's denial of defendant's motion to arrest judgment was therefore proper, and defendant's argument is rejected.

**[15]** Defendant next argues that the trial court erred in granting the state's request for discovery of defendant's medical, psychological,

and military records in violation of N.C.G.S. § 15A-906. Defendant asserts the trial court's error prejudiced him, thereby warranting a new trial. We disagree.

On 6 January 2000, the trial court denied the state's motion to compel defendant to provide access to his records in compliance with a 16 December 1999 order. Because the motion was denied, defendant cannot show prejudice under N.C.G.S. § 15A-1443. We therefore need not entertain this argument. *See State v. Braxton*, 352 N.C. 158, 202, 531 S.E.2d 428, 454 (2000) (defendant not prejudiced where trial court reversed its prior ruling and instructed jury on lesser-included offenses according to defendant's initial request), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *see also State v. Woods*, 345 N.C. 294, 311-12, 480 S.E.2d 647, 655 (defendant has no grounds to assign error on appeal where trial court sustains defendant's objection), *cert. denied*, 522 U.S. 875, 139 L. Ed. 2d 132 (1997).

[16] Defendant next challenges the trial court's denial of his motion filed 18 January 2000, six days into trial, seeking the dismissal of the public defenders appointed to represent defendant and the substitution of retained counsel. The motion cited a "lack of confidence" in appointed counsel and a "breakdown in communication" between defendant and appointed counsel as its bases. Defendant did not allege ineffective assistance of counsel at trial. Although the trial court invited defendant to present evidence in support of the motion, defendant presented only an affidavit stating that he or someone on his behalf was prepared to pay for substituted counsel. The trial court declared that it would consider the motion as containing an "implicit . . . prospective motion to continue." The trial court then made findings and denied the motion. In his brief to this Court, defendant makes no argument that his Sixth Amendment rights were abridged. Rather, defendant argues that the act of filing the motion should be an adequate indicator of serious problems in the attorney-client relationship because defendant was represented by attorneys with whom he had significant differences.

Defendant offers no authority for the proposition that a mere request to substitute appointed counsel with retained counsel is sufficient. In fact, this Court has upheld the denial of a defendant's request to substitute retained counsel where he or she offered no justifiable basis for the replacement and where doing so would obstruct the orderly procedure of trial. *State v. Poole*, 305 N.C. 308, 318-19, 289 S.E.2d 335, 341-43 (1982) (" 'Without any . . . justifiable basis, there is

no constitutional right under the Sixth Amendment to a continuance to enable defendant to seek new counsel on the day of the trial.' ") (quoting *United States v. Hampton,* 457 F.2d 299, 301-02 (7th Cir.), *cert. denied,* 409 U.S. 856, 34 L. Ed. 2d 101 (1972)); *State v. Gray,* 292 N.C. 270, 281, 233 S.E.2d 905, 913 (1977) ("Defendant's assertion that he wished to employ his own counsel, made as it was, on the day trial was to begin . . . , was no ground for the dismissal of his court-appointed counsel."). The trial court in its discretion properly denied defendant's motion. This argument is rejected.

[17] By his next argument, defendant alleges that potential ineffective assistance of counsel (IAC) claims arose at trial. Defendant contends that although the claims are sufficiently apparent for him to identify, they are not sufficiently developed to present for resolution on the merits.

To avoid procedural default under N.C.G.S. § 15A-1419(a)(3), defendants must raise those IAC claims on direct review that are apparent from the record. *See* N.C.G.S. § 15A-1419(a)(3) (2001). In the instant case, defendant contends that two IAC claims are suggested by the record but are insufficiently developed for review: (1) his attorneys were inadequately prepared because they failed to procure certain records, and (2) defense counsel made no effort to rehabilitate jurors challenged for cause because of their views on the death penalty.

With regard to the first IAC issue—that defendant's counsel was ineffective in failing to procure certain records that could be used to impeach key government witnesses—we hold that because defendant is not in a position to adequately develop this IAC claim at this time, his claim is dismissed without prejudice to his right to reassert this claim during a subsequent motion for appropriate relief proceeding. *See State v. Kinch,* 314 N.C. 99, 106, 331 S.E.2d 665, 669 (1985). Regarding defendant's second IAC claim—that defense counsel failed to rehabilitate jurors who expressed equivocal views on the death penalty—the record reveals that such claims may be developed and argued without the safeguards available in article 89 of chapter 15A of the North Carolina General Statutes. Defendant asserts before this Court that his attorneys did not rehabilitate jurors with allegedly equivocal views on the death penalty. He presents no supporting arguments, however, and fails to direct our attention toward the *voir dire* of a single juror worthy of rehabilitation. We find no merit to this IAC claim.

## PRESERVATION ISSUES

Defendant raises additional issues that have previously been decided by this Court contrary to his position: (1) whether the trial court erred in denying defendant's motion to strike the death penalty as unconstitutional, (2) whether the trial court erred in denying defendant's motion to dismiss the short-form murder indictments because they failed to allege all the elements of first-degree murder, and (3) whether the trial court erred in allowing the state to death-qualify the jury. We have considered defendant's contentions on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these arguments.

## PROPORTIONALITY REVIEW

[18] Finally, pursuant to our statutory duty, we must determine: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death penalty is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2001).

Defendant was convicted of two counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury found four aggravating circumstances to exist in each case: (1) the murder occurred during the commission of first-degree rape, N.C.G.S. § 15A-2000(e)(5); (2) the murder occurred during the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); (3) the murder occurred during the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); and (4) the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

The trial court submitted two statutory mitigating circumstances as to each murder on defendant's behalf: the age of defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and the catchall circumstance, N.C.G.S. § 15A-2000(f)(9). The jury did not find these mitigating circumstances in either of the two cases. Of the thirty-three nonstatutory mitigating circumstances identically submitted for consideration regarding each murder, one or more jurors found that twelve existed and had mitigating value.

Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. We find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Thus, we now address our final statutory duty of proportionality review.

The purpose of proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Atkins*, 349 N.C. 62, 114, 505 S.E.2d 97, 129 (1988) (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). "In our proportionality review, we must compare the present case with other cases in which this Court has ruled upon the proportionality issue." *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death penalty to be disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517, (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was found guilty of two first-degree murders on the basis of premeditation and deliberation and under the felony murder rule. We have held that a finding of premeditation and deliberation indicates "a more calculated and cold-blooded crime." *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Defendant kidnapped and raped two women and then murdered them in cold blood by stabbing them multiple times. This evidence of premeditation and deliberation supports the proportionality of the death penalty in this case. Second, this Court has never found the death penalty to be disproportionate in a case where a defendant was found guilty of multiple murders. *State v. McLaughlin*, 341 N.C. 426, 464, 462 S.E.2d 1, 22 (1995), *cert. denied*,

516 U.S. 1133, 133 L. Ed. 2d 879 (1996). Third, the jury found the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance and the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance in connection with each murder. This Court has held that either the (e)(5) aggravating circumstance or the (e)(11) aggravating circumstance, standing alone, is sufficient to support a sentence of death. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

"We also compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in that pool when engaging in its duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* Whether a sentence of death is disproportionate in a particular case "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47 (quoting *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983)), *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Accordingly, we conclude that this case is more similar to cases in which we have found the death penalty proportionate than to those in which we have found it disproportionate.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentences of death were excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Therefore, the judgments of the trial court must be left undisturbed.

NO ERROR.