STATE OF NORTH CAROLINA
v.
LEWIS EDWARD PERSON
No. COA09-989
Court of Appeals of North Carolina.
Filed April 6, 2010
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General R. Marcus Lodge, for the State.
Thomas R. Sallenger for defendant-appellant.
HUNTER, JR., Robert N., Judge.
Lewis Edward Person ("defendant") challenges his conviction and judgment for first-degree rape on the basis that the trial court erred in denying his motion to dismiss the charge for lack of sufficient evidence of each element of the offense and that defendant was the perpetrator of the offense. We find no error in his trial.

FACTS
The State's evidence tends to show that A.M. ("Amanda") and her twin sister A.M. ("Amy")[1] were at their home on 24 July 2007. The sisters were sixteen years old at the time. They were playing video games while both of their parents were at work. Just before eleven o'clock in the morning, Amanda looked out the window and saw that defendant had pulled up in his truck. Defendant, known as "Bay" to the family, was a good friend of the girls' father, and Amanda was used to seeing him come to the house.
A television show was about to come on at 11:00 a.m. that the girls were planning to watch, so the girls stopped playing video games. Amy went to her room. Amanda heard a knock on the front door, so she answered it. Defendant was there, and he asked for a glass of water. He did not enter the house. Amanda closed the door and went to get a glass of water. She went outside with the glass, but didn't immediately see defendant, so she walked around the house to the back, and saw him sitting on a chair in the backyard. He got up to meet Amanda and she gave him the glass of water.
Amanda turned to start walking back to the house. Defendant grabbed Amanda around the waist from behind, and they struggled. She tried to kick and get away. She yelled out several times for Amy, but Amy did not come out. Defendant pulled Amanda over to her father's car, and she struggled some more and was able to get loose.
Defendant then pulled a knife from his pocket, flipped it open, and said to her, "Do you see what I have? That's  I will use this if you don't do what I say." Amanda stated she was scared and did what he told her. He told her to open the car door. She resisted initially, but he threatened her with the knife, and she got into the car. Defendant told her to lay down on the driver's side in the front seat. At some point he put the knife back in his pocket. He pulled down Amanda's pajama bottoms and underwear, pulled his own pants down, and inserted his penis into her vagina. He did not use a condom. Amanda stated she felt pressure in her private area, as well as some pain.
Defendant was still on top of Amanda when she heard Amy's voice saying, "What the hell are you doing on top of my sister?" Amy had come out of the house to check on her sister, and she saw that the door to her father's Oldsmobile was open. She went around the side and saw defendant on top of Amanda, having intercourse with her. Defendant jerked his body away from Amanda and said, "You didn't see nothing." He pulled his pants up, went over to his truck, and kept saying to Amy, "You didn't see anything." He got in his truck and drove away.
Amanda and Amy went back into the house and locked the door. They tried to call their parents but the phone was disconnected. They decided to walk up the road to their grandfather's house, but he was not at home. They went back to their house and waited until their father got home in the afternoon. After he got home, he took the girls to the hospital, where Amanda underwent a rape kit examination by a Sexual Assault Nurse Examiner. Evidence was collected including: the underwear Amanda was wearing at the time of the rape, pubic hair samples, and a vaginal swab from inside the vagina. No bruising or "obvious signs of trauma" or injury were noted during the physical examinations of Amanda's body. The nurse examiner testified that most victims of sexual assault show no obvious signs of trauma after an assault.
Amanda also spoke with law enforcement officials about the incident. She described defendant's knife as being about six inches long with a silver handle, and that it looked dirty. She stated in court that she did not consent to what defendant did to her, and she had never had sexual intercourse prior to the incident with defendant.
On the night after the incident, police officers went to defendant's house to question him without taking him into custody. Defendant initially denied going to the victim's house at all on that day. Then he told the investigating officer that he had gone by the victim's house. He stated he went by around 3:00 p.m. to pick up his lawnmower, but denied having grabbed or having sex with one of the girls. He did acknowledge that one of the girls brought him water. He said that after drinking the water, he left because there was no one to help him load the lawnmower into his truck. Police collected two knives from defendant's house for evidence, including one that had a silver handle.
Two days later, defendant agreed to be interviewed at the Wake County Sheriff's Office. When he arrived, police did not take him into custody. He told a different officer at that meeting that when he went to the victim's house to pick up his lawnmower, one of the girls brought him water and then went and sat in a gray car that was located in the yard. Then the other sister came out and asked him, "What the hell are you doing?" He said he did not know why she asked that, and he left after that. When asked about prior interaction with the girls, defendant stated that about a month prior to this incident, he was over at the their house when Amanda approached him and put her hand between his legs. He said he never told anyone about it.
The interviewing officers pressed defendant about whether anything further happened on 24 July. Defendant then stated that when Amanda came out with the water, she got into the car and pulled down her pants. At that point, her sister came out and asked, "What the hell is going on?" When asked if he touched Amanda at all, defendant told the officers that he did touch her on the inside of her leg with his hand, before the sister came out and asked what was going on. After the interview, the officers obtained a warrant, and arrested defendant for first-degree rape. Evidence was collected from defendant and a suspect kit was prepared.
Forensic analysis revealed the presence of semen in the vaginal swabs, as well as in the victim's underwear. The analysis showed that the sperm obtained from defendant matched the sperm found on Amanda's underwear. Zach Kallenbach, the State's expert forensic biologist, stated that it was "two point two three thousand trillion times more likely" that the sperm came from defendant as opposed to another member of the "North Carolina black population."
The analysis of the vaginal swabs inside the vagina showed that the semen came from only one source, and though the analysis could not determine whether defendant was a match, it did show that defendant could not be excluded from being the source. Mr. Kallenbach testified that he could not conclusively match the sperm sample from the vaginal swab to defendant's sperm, because the mixture of sperm and non-sperm cells present in most vaginal swabs taken from victims of sexual assault makes it difficult to isolate identifiable DNA. However, Mr. Kallenbach did testify, "All of the parts [of the vaginal swabs] that I looked at could be attributed to either the victim or the suspect, so that's why I say he cannot be excluded as a contributor."
Defendant did not present any evidence. At the close of the State's evidence and at the close of all the evidence, he moved to dismiss the charge. Both motions were denied. After deliberations, the jury returned a verdict of guilty of first-degree rape. The trial court sentenced defendant to an active term in the presumptive range of a minimum of 384 months' to a maximum of 470 months' imprisonment. From the judgment entered, defendant appeals.

ANALYSIS
Defendant contends the trial court erred in denying his motion to dismiss where the State failed to produce substantial evidence of each essential element of the offense of first-degree rape. He argues there was insufficient evidence that a rape did in fact occur and that he employed or displayed a deadly weapon during the alleged rape. He bases his argument on what he describes as the "incredible and unbelievable" testimony by Amanda that the contact was not consensual, and asserts the State failed to produce any evidence linking any of the knives found during the investigation to the incident in question. We find no merit to defendant's arguments.
When a trial court is faced with a motion to dismiss for lack of sufficient evidence, the court must determine whether the State has presented substantial evidence (1) of each essential element of the offense charged or a lesser included offense and (2) of defendant's identity as the perpetrator. State v. Earnhardt, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conviction." State v. Jarrett, 137 N.C. App. 256, 262, 527 S.E.2d 693, 697 (2000). Upon appellate review, we are compelled to view the evidence in the light most favorable to the State, with all reasonable inferences to be drawn therefrom. State v. Scott, 356 N.C. 591, 596, 573 S.E.2d 866, 869 (2002). Any contradictions or discrepancies in the evidence are for the jury to resolve and do not warrant dismissal of the case. Id. "If there is substantial evidence  whether direct, circumstantial, or both  to support a finding that the offense charged has been committed and that the defendant committed it, a motion to dismiss should be denied." State v. Herring, 322 N.C. 733, 738, 370 S.E.2d 363, 367 (1988). Further, any issues regarding credibility of the witnesses are for the jury to resolve. State v. Hyatt, 355 N.C. 642, 666, 566 S.E.2d 61, 77 (2002).
The offense of first-degree rape may be proved by showing: (1) a "person engage[d] in vaginal intercourse" (2) "[w]ith another person by force and against the will of the other person" while (3) "[e]mploy[ing] or display[ing] a dangerous or deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon." N.C. Gen. Stat. § 14-27.2(a) (2008); State v. Worsley, 336 N.C. 268, 275, 443 S.E.2d 68, 71 (1994). A weapon is "employed" if the person has the weapon in his possession at the time of the rape. State v. Langford, 319 N.C. 340, 344, 354 S.E.2d 523, 526 (1987).
Viewing the evidence in the light most favorable to the State, we find that the evidence presented is more than sufficient to withstand a motion to dismiss. Amanda and Amy both testified that they had known defendant over several years due to his friendship with their father, thereby proving defendant's identity as the perpetrator of the crime. In particular, the testimony of Amanda constitutes substantial evidence of each essential element of the crime. Amanda testified that defendant grabbed her, she tried to get away by kicking and struggling, and she yelled for help several times. She related that defendant then pulled out a knife and threatened to use it on her if she didn't do as she was told. Defendant threatened Amanda and made her get into the front seat of the car and lie down. This testimony is sufficient to prove the elements of the use of force against Amanda's will, as well as the element that defendant employed or displayed a deadly or dangerous weapon. Finally, Amanda testified that defendant inserted his penis into her vagina, constituting vaginal intercourse. Her sister Amy witnessed the end of the incident and corroborated Amanda's version of the incident. Moreover, forensic analysis matched defendant's DNA to semen samples collected from Amanda's clothing. All of this evidence, taken together, provides substantial evidence of each element of the offense of first-degree rape such that the trial court did not err in sending the matter to the jury for deliberation.
Defendant also contends the trial court erred in failing to instruct the jury on a lesser included offense where the evidence of the use of a deadly or dangerous weapon was "conflicting." We note, however, that trial counsel did not request such an instruction or object to the instructions as given, and this issue is therefore not preserved for appellate review. N.C.R. App. P. 10(b)(2) (2009). In any case, we have determined that sufficient evidence was presented that defendant employed or displayed a deadly weapon in the course of the crime, and defendant's argument cannot stand. We find no error in defendant's trial.
No error.
Judges McGEE and GEER concur.
Report per Rule 30(e).
NOTES
[1] The pseudonyms of Amanda and Amy are used throughout this opinion to protect the privacy of the victim and her family, and for ease of reading.