STATE OF NORTH CAROLINA v. TODD CHARLES BOGGESS

No. 310A97

(Filed 13 August 2004)

## 1. Jury— peremptory challenges—voir dire reopened

The trial court erred in a first-degree murder and robbery with a dangerous weapon case by failing to allow defendant to exercise one of his remaining peremptory challenges to excuse a juror after the trial court permitted counsel to question the juror upon finding out that after completing her individual voir dire the juror learned that defendant's mother would be staying at the home of one of the juror's friends during the trial, because: (1) if the judge at any point allows the attorneys to question the juror directly, voir dire has necessarily been reopened and the procedures set out in N.C.G.S. § 15A-1214(g)(1)-(3) are triggered; and (2) once the examination of a juror has been reopened, the parties have an absolute right to exercise any remaining peremptory challenges to excuse such a juror.

## 2. Criminal Law— recordation and transcription— reconstruction

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by allegedly failing to ensure the complete recordation and transcription of all critical stages of his trial, because: (1) although defendant contends the trial court improperly denied his pretrial motions for a bill of particulars, this issue is moot since the case is being remanded for

**STATE v. BOGGESS**

[358 N.C. 676 (2004)]

retrial, defendant has now heard the evidence in the case, and the transcript of the first trial is available; (2) the trial court's reconstruction accurately cited the notices that defendant had filed prior to trial concerning his mental state, and other than the ultimate fact that the judge allowed the State's motion to have defendant evaluated, defendant has not shown any prejudice alleged to have arisen from the loss of the content of these arguments; and (3) although defendant contends that he cannot know the reasons why the trial court denied his objection to being arraigned in Durham County, denied his contention that Durham County was not a proper venue for the trial, and denied his motion to continue the arraignment, defendant failed to set out any way in which he was prejudiced by the loss of the recording of the arguments as to these motions.

**3. Confessions and Incriminating Statements— motion to suppress—ambiguous request for counsel**

The trial court did not err in a first-degree murder and robbery with a dangerous weapon case by denying defendant's motion to suppress his custodial statements, because: (1) in regard to defendant's interview on 24 August 1995 at the sheriff's department, defendant's words that "[i]f y'all going to treat me this way, then I would probably want a lawyer" did not constitute a request for an attorney, and thus, his voluntary statements after a knowing waiver of his rights were admissible; (2) investigators did not violate defendant's Fifth Amendment rights when they responded to his 25 August 1995 request to discuss his case, and defendant waived his Sixth Amendment right to counsel; and (3) in regard to defendant's 17 October 1995 statement, defendant knowingly waived his Fifth and Sixth Amendment rights to counsel when he gave this statement since he initiated this conference.

**4. Sentencing— capital—instructions—meaning of life sentence**

The trial court erred in a first-degree murder case by its reinstruction to the jury pertaining to the meaning of a life sentence when it inserted extraneous language that the jury should decide the question of punishment according to the issues submitted by the trial court wholly uninfluenced by consideration of what another arm of the government might or might not do in the future.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Orlando F. Hudson, Jr., on 20 March 1997 in Superior Court, Durham County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 April 2004.

> *Roy Cooper, Attorney General, by William B. Crumpler and Robert C. Montgomery, Assistant Attorneys General, for the State.*
>
> *Office of the Appellate Defender, by Staples Hughes, Appellate Defender; and Daniel K. Shatz, for defendant-appellant.*

EDMUNDS, Justice.

In August 1995, Todd Boggess (defendant) and his girlfriend, Melanie Gray (Gray), a fourteen-year-old runaway, were staying together at Wrightsville Beach. The victim in this case, Danny Pence (Pence), lived with his parents in Wilmington and was a rising senior at Laney High School. He owned a 1987 Ford Mustang automobile that his parents had given him about the time he turned sixteen. Although Pence customized his Mustang by repainting it, improving the sound system, and changing the wheels, at the time of his death he was considering selling it and purchasing a motorcycle.

Pence was employed at Philly Steak and Sub in Murrayville. On the evening of 21 August 1995, Pence went home after completing his day's work, and then, at about 10:00 p.m., drove his Mustang to Johnny Mercer's Pier, a hangout for teenagers at Wrightsville Beach. Defendant and Gray were also at Johnny Mercer's Pier that night. Defendant asked Adam Fredericks if he knew anyone who was selling a car. After checking with Pence, Fredericks told defendant that Pence was interested in such a sale. Pence showed his Mustang to defendant, and they left together on a test ride. Defendant was driving, while Pence was in the front passenger seat and Gray was in one of the rear seats. When Pence did not return home that evening, his increasingly-worried mother searched unsuccessfully for him and then filed a missing person's report with the New Hanover County Sheriff's Department.

The next morning, 22 August 1995, a male and female matching the descriptions of defendant and Gray were observed driving Pence's Mustang on Terry Road in Durham County. At approximately 10:30 a.m., defendant and Gray pawned in Durham speakers from

**STATE v. BOGGESS**

[358 N.C. 676 (2004)]

Pence's car and a socket set that Pence's father had given him to keep in the car. Around noon, several teenage boys who were gathered in a wooded area along Terry Road found a body and notified the police. The body was subsequently determined to be Pence's. During an autopsy performed the next day, the forensic pathologist observed multiple injuries to the victim's head and body. Based on the number of wounds, the pathologist's opinion was that Pence had been beaten over a period of time. He testified that the cause of Pence's death was "blunt-force trauma, multiple blows, but most importantly the blows that struck him in the head and caused injury to the skull and the brain."

Connecting Pence's disappearance from Wilmington with the discovery of a body in Durham County, Beaufort County Sheriff's deputies began surveillance of the home of defendant's parents in Chocowinity. On 24 August 1995, investigators spotted Pence's Mustang, which had been repainted, in front of the Boggess residence. Following a brief and unsuccessful attempt to evade capture by fleeing into a cornfield, defendant and Gray surrendered.

Defendant made several post-arrest statements in which he admitted stealing Pence's car and beating him. All these statements were introduced as evidence at trial. Details of the statements will be discussed below.

Defendant was tried capitally at the 13 January 1997 Criminal Session of Superior Court, Durham County. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation; felony murder, with kidnapping and robbery with a dangerous weapon serving as the underlying felonies; and murder by torture. He was also convicted of first-degree kidnapping and robbery with a dangerous weapon. At defendant's sentencing proceeding, the jury found three aggravating circumstances: that the murder was committed while defendant was engaged in kidnapping; that the murder was committed for pecuniary gain; and that the murder was especially heinous, atrocious, or cruel. The jury also found nine of twenty-two submitted mitigating circumstances. The jury then found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and recommended a sentence of death. The trial court arrested judgment as to the conviction of first-degree kidnapping, imposed a sentence of death as to the murder, and sentenced defendant to a 69 to 92 months' imprisonment for the conviction of robbery with a dangerous weapon. The appeal of this case was

delayed substantially because of a dispute between the State and the court reporter over payment for a transcript of the trial.

## JURY SELECTION ISSUE

[1] Defendant first claims that the trial court erred when it would not allow him to exercise one of his peremptory challenges to excuse juror Nita Gladstone. Jurors in this case were selected after individual *voir dire*. After juror Gladstone was selected, she was allowed to go home, subject to the court's call to return once all the jurors had been selected. However, when juror Gladstone was contacted and told to report back to court, she advised the clerk that, after completing her individual *voir dire*, she had learned that Mrs. Pence, who was both the mother of the victim and a witness for the prosecution, would be staying with one of juror Gladstone's friends during the trial. At this point, the jury had not been impaneled and defendant had not exhausted his peremptory challenges.

The clerk reported this information to the trial judge, who advised counsel in open court what had happened. The judge and counsel recognized that the pertinent statute is N.C.G.S. § 15A-1214(g), which states:

(g) If at any time after a juror has been accepted by a party, and before the jury is impaneled, it is discovered that the juror has made an incorrect statement during voir dire or that some other good reason exists:

(1) The judge may examine, or permit counsel to examine, the juror to determine whether there is a basis for challenge for cause.

(2) If the judge determines there is a basis for challenge for cause, he must excuse the juror or sustain any challenge for cause that has been made.

(3) If the judge determines there is no basis for challenge for cause, any party who has not exhausted his peremptory challenges may challenge the juror.

Any replacement juror called is subject to examination, challenge for cause, and peremptory challenge as any other unaccepted juror.

N.C.G.S. § 15A-1214(g) (2003). The attorneys and the judge discussed both the potential significance of this new information and the proper

response. The district attorney suggested that the judge could either find the information was insufficient to warrant further inquiry or ask juror Gladstone questions without formally reopening *voir dire*. Defense counsel argued that any inquiry of juror Gladstone would reopen jury selection. The judge, observing that N.C.G.S. § 15A-1214(g) did not give specific guidance as to the procedure a court must follow under the circumstances presented here, remarked:

> The issue is, what does reopen it mean? I don't know. If the juror comes out here and tells us some information, I mean, can the Court decide it wants to reopen after it hears that information, or is the fact of the juror coming out here telling us . . . is that reopening?

After thoughtful discussion with counsel, the judge declared:

> I'm going to bring the juror out and ask her to go ahead and state what it is she wants to be heard about. After the juror tells us that, the Court will make some decision about whether or not the Court should reopen the voir dire under our [s]tatutes . . . .

When juror Gladstone was brought into the courtroom, the judge asked a very few questions about the situation. Her statement in response was consistent with the report originally made by the clerk. The judge excused juror Gladstone from the courtroom and continued his discussion with counsel. Both the district attorney and defense counsel asked the judge to pose additional questions. Defense counsel also advised the court that if he had known this information while he was originally questioning juror Gladstone, he would have excused her peremptorily. Despite defense counsel's continued argument that *voir dire* was reopened as soon as any questions were asked of juror Gladstone, the judge determined that he had not found that good cause existed to reopen *voir dire*. The judge then had juror Gladstone returned to the court for additional inquiry. She advised that Mrs. Pence was friends with the daughter of one of juror Gladstone's friends and would be staying at the home of juror Gladstone's friend during the trial. After receiving this information, the judge allowed counsel to question juror Gladstone.

The next day, citing *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988),

the judge concluded that a trial court has the authority to question a juror before determining whether good cause exists to reopen *voir dire*. The judge then found, "based on the hearing that was held, based on all your arguments, that good cause does not exist to reopen voir dire and allow the lawyers an additional time to question Ms. Gladstone." Defendant renewed his objection and noted for the record that he would have exercised a peremptory challenge on juror Gladstone if the *voir dire* had been reopened.

Although the parties and the trial judge here spoke of "reopening" *voir dire*, that term is not found in N.C.G.S. § 15A-1214(g). Nevertheless, we agree that the statute can be interpreted logically only when it is read as permitting a judge to reopen *voir dire* if the initial conditions specified in that statute are found to exist. Accordingly, the key question is the nature of the initial inquiry a court may appropriately conduct before making a determination whether a juror has made an incorrect statement or whether a good reason to reopen *voir dire* has been discovered.

Earlier decisions of this Court that address related issues reveal guiding principles. In *State v. Freeman*, 314 N.C. 432, 333 S.E.2d 743 (1985), before the jury was impaneled, a juror who had been passed by both parties spontaneously admitted that she had provided incorrect information. The trial judge allowed the attorneys to ask additional questions of the juror. We held that the trial court committed reversible error in not allowing the defendant to exercise his final peremptory challenge at that time. *Id.* at 437-38, 333 S.E.2d at 746-47. In *State v. Rogers*, after both sides passed a juror, but before the jury was impaneled, the district attorney discovered that the juror could have provided false information during *voir dire*. The trial judge conducted a hearing during which a witness verified that the information was false. The judge then called the juror and asked additional questions. When the juror admitted giving inaccurate information, the prosecutor exercised a peremptory challenge. We found that this procedure comported with N.C.G.S. § 15A-1214(g). *State v. Rogers*, 316 N.C. at 215-16, 341 S.E.2d at 720-21. In *State v. Willis*, 332 N.C. 151, 420 S.E.2d 158 (1992), the trial judge received allegations that family members of one of the parties had been in contact with a juror. The judge stated on the record that when he had asked the juror if any contact had taken place, the juror denied it. The judge conducted no further inquiry. Determining that the trial court had discretion as to what inquiry to make, we found no error. *Id.* at 172-74, 420 S.E.2d at 168.

When read with the statute, these cases indicate that a trial judge has leeway to make an initial inquiry when allegations are received before a jury has been impaneled that would, if true, establish grounds for reopening *voir dire* under N.C.G.S. § 15A-1214(g). As part of this initial investigation, the judge may question any involved juror and may consult with counsel out of the juror's presence. Based on information thus developed, the judge has discretion to reopen *voir dire* or take other steps suggested by the circumstances. Because the jury has not been impaneled and other potential jurors are still available, minimal disruption occurs if the judge resolves any doubts in favor of reopening *voir dire* and accords counsel the right to exercise any remaining peremptory challenges. If the judge at any point allows the attorneys to question the juror directly, *voir dire* has necessarily been reopened and the procedures set out in N.C.G.S. § 15A-1214(g)(1)-(3) are triggered. "[O]nce the examination of a juror has been reopened, 'the parties have an absolute right to exercise any remaining peremptory challenges to excuse such a juror.' " *State v. Rogers*, 316 N.C. at 216, 341 S.E.2d at 721 (quoting *State v. Freeman*, 314 N.C. at 438, 333 S.E.2d at 747). Accordingly, the trial judge erred when he permitted counsel to question juror Gladstone but did not allow defendant thereafter to exercise one of his remaining peremptory challenges.

## ADDITIONAL ISSUES

Although defendant's conviction must be reversed because of the error in jury selection, we will address additional issues that may arise upon retrial.

### I. Pretrial Motions

**[2]** Defendant argues that the trial court erred by failing to ensure the complete recordation and transcription of all critical stages of his trial. On 2 April 1996, defendant filed a number of pre-trial motions, including a "Motion for Complete Recordation of All Proceedings." The trial court allowed the motion on 13 November 1996. On that same date, the court also ruled on several other pre-trial motions that defendant had filed. Years later, when the record of the case was being settled preparatory to appeal, the trial court determined that the hearing on those motions had been tape recorded but never transcribed, and that the tape had been irretrievably lost. The trial judge conducted a hearing on 9 February 2001, and on 7 June 2002, entered a "Reconstruction of Hearing" (Reconstruction) in which he set out the motions that had been heard and the resolution of those motions.

Defendant generally contends that because the record does not contain the arguments made at the hearing on the motions, he has been prejudiced because he cannot reconstruct the showings made as to each motion. Moreover, in his brief, defendant specifically objects to the trial court's treatment of certain motions and argues that the failure to provide complete transcription of the 13 November 1996 hearing has made it impossible for him to obtain "full and fair appellate review" of these issues.

First, defendant argues that the trial court improperly denied his pre-trial motions for a bill of particulars. Because the case is being remanded for retrial, this issue is moot. Defendant has now heard the evidence in the case and the transcript of the first trial is available. Thus, it is immaterial whether the trial court abused its discretion in denying the motions for a bill of particulars. *State v. Garcia*, 358 N.C. 382, 597 S.E.2d 724 (2004).

Defendant next claims that the arguments relating to the State's motion to have his mental competence evaluated are important to his appeal. The trial court found in its Reconstruction

> [t]hat the Court then heard the State's Motion to Evaluate Defendant at Dorothea Dix. District Attorney James E. Hardin, Jr. argued that this was appropriate due to the defendant's attorneys previously filed notices of insanity and diminished capacity defenses. The Court granted this motion. The Court ordered that any documents from Dorothea Dix regarding this defendant's evaluation be sealed.

Although defendant maintains that the contested mental evaluation constitutes a substantial issue on appeal, the trial court's Reconstruction accurately cited the notices that defendant had filed prior to trial concerning his mental state. Accordingly, defendant had placed his mental competence at issue.

> Where a defendant gives notice of his intent to pursue a defense of insanity, it is not only reasonable, but necessary, that the prosecution be permitted to obtain an expert examination of him. Otherwise there would be no means by which the State could confirm a well-founded claim of insanity, discover fraudulent mental defenses, or offer expert psychiatric testimony to rebut the defendant's evidence where insanity is genuinely at issue. Thus, we believe that the trial court has the authority to order such an examination as a part of its inherent power to oversee the proper administration of justice.

*State v. Jackson*, 77 N.C. App. 491, 498, 335 S.E.2d 903, 907-08 (1985); *see also State v. Huff*, 325 N.C. 1, 49, 381 S.E.2d 635, 663 (1989), *judgment vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). We acknowledge that defendant's argument is not so much that the order requiring that he be evaluated was incorrect as it is that his appeal is hampered because he cannot now know the arguments that were made in support of and in opposition to this motion. Nevertheless, we have held in the context of unrecorded bench conferences in a capital case that "it is the trial court's evidentiary rulings, and not the arguments of counsel during a bench conference, that facilitate effective appellate review." *State v. Blakeney*, 352 N.C. 287, 307, 531 S.E.2d 799, 814 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). In addition, a defendant must establish that he was prejudiced by the failure to record the proceedings. *See State v. Pittman*, 332 N.C. 244, 251-53, 420 S.E.2d 437, 441-42 (1992). Other than the ultimate fact that the judge allowed the State's motion, defendant has not specified, nor can we see, any prejudice alleged to have arisen from the loss of the content of the arguments. Because the trial court's decision ordering the examination was fully supported by the holdings both of this Court and of the Court of Appeals and is reviewed for abuse of the trial court's inherent power, we do not perceive that defendant has been denied effective appellate review of this issue or that the trial court erred in ordering the evaluation.

Finally, defendant argues that he cannot know the reasons why the trial court denied his objection to being arraigned in Durham County, denied his contention that Durham County was not a proper venue for the trial, and denied his motion to continue the arraignment. Again, defendant has not set out any way in which he was prejudiced by the loss of the recording of the arguments as to these motions. *See id.* The trial court correctly set out in its Reconstruction that Durham County was a proper venue for the trial. *See* N.C.G.S. § 15-133 (2003). Moreover, rulings on motions to continue are ordinarily within the discretion of the trial court. *State v. Williams*, 355 N.C. 501, 540, 565 S.E.2d 609, 632 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Therefore, we hold that defendant has not been denied effective appellate review as to these issues and that the trial court did not err in its ruling on these matters.

We have also carefully reviewed the trial court's Reconstruction of the other motions heard and resolved at the 13 November 1996 hearing and have determined that defendant has not been prejudiced

because arguments made at the hearing cannot be recovered. Accordingly, this assignment of error is overruled.

## II. Defendant's Statement

[3] Defendant's next claim is that the trial court erred in denying his motion to suppress his custodial statements. Defendant's "Motion to Suppress Any In-Custody Statement of Defendant" and accompanying affidavit recite that defendant made an oral statement to detectives of the Durham County Sheriff's Department on 25 August 1995, and that trial counsel were appointed to represent defendant on 28 August 1995. Defendant further alleges that when he was questioned again on 17 October 1995, investigators only advised him of his Fifth Amendment right to counsel, but not his Sixth Amendment right to counsel. The trial court conducted an evidentiary hearing on 16 December 1996 and at the conclusion of the hearing orally denied defendant's motion to suppress. The trial court later entered a written order dated 11 December 2000, effective *nunc pro tunc* 16 December 1995, making extensive findings of fact and conclusions of law.

We will address each of defendant's statements separately. Defendant was first interviewed by New Hanover County Sheriff's Detective Marcus Benson on 24 August 1995 while at the Beaufort County Sheriff's Department. Defendant was read his *Miranda* rights and signed a written waiver of those rights. He then gave a somewhat disjointed statement in which he claimed that he had stolen Pence's Mustang but left the victim unharmed in Durham. After completing his narration, defendant provided a written version of this statement. Detective Benson told defendant that he did not believe this statement, and a heated exchange ensued. When one of the investigators told defendant that he was a "lying piece of s——," defendant responded, "I'm not lying. I'm telling the truth. If y'all going to treat me this way, then I probably would want a lawyer."

The investigators then terminated the interview and Detective Benson, along with New Hanover County Sheriff's Detective Douglas Vredenburgh, transported defendant to Wilmington. Although the detectives had some desultory conversation with defendant during the trip, they did not discuss the case under investigation. Upon their arrival at the New Hanover County Law Enforcement Center, Detective Vredenburgh began filling out an arrest report. Defendant spontaneously spoke up and said that what he had told the investigators earlier was not correct and that he had hit the victim with a

stick. When asked, defendant said he had no objection to the investigators recording any further conversation. Defendant stated that he recalled his rights and acknowledged that no promises or threats had been made to him. Defendant then admitted taking Pence's car at knifepoint, tying him up, and taking him to a site in Durham where he beat Pence in the head with a board and a rock.

Although defendant argues that this statement was inadmissible because he had asked for a lawyer, we agree with the trial court's conclusion that defendant's words, "[i]f y'all going to treat me this way, then I probably would want a lawyer," do not constitute a request for an attorney. We have held that a request for counsel must be unambiguous. *State v. Hyatt*, 355 N.C. 642, 655, 566 S.E.2d 61, 70 (2002) (citing *Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 371 (1994)), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003). "Unless the in-custody suspect 'actually requests' an attorney, lawful questioning may continue." *Id.* (quoting *Davis v. United States*, 512 U.S. at 462, 129 L. Ed. 2d at 373). Defendant's conditional statement was not an actual and unambiguous request. Instead, his words reflect that he understood perfectly well his right to an attorney and was threatening to exercise it unless the investigators improved their behavior. Because defendant's 24 August 1995 statement was made voluntarily after a knowing waiver of his rights, it was admissible at his trial. *See Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

Defendant's next statement was made on 25 August 1995. Defendant was taken before a judge in New Hanover County early that morning, and counsel was appointed to represent him. After defendant spoke briefly with the attorney, he was transported to Durham County, where he was booked. Defendant asked Durham County Sheriff's Detective O. A. Clayton, Jr., if they would have a chance to talk later. After defendant appeared before a Durham County magistrate, he was taken to an interview room. There Detective Clayton formally introduced himself and asked defendant if he had an attorney. When defendant responded affirmatively, Detective Clayton gave him a business card and told defendant that he was available if defendant needed anything. Defendant then told Detective Clayton that he wanted to talk with him. Detective Clayton made arrangements to transport defendant to his office. They proceeded to a conference room, where, with Detective Gordon, the interview was recorded. Detective Clayton began by readvising defendant of all of his *Miranda* rights, including defendant's right to

talk to a lawyer and have the lawyer present. After acknowledging each right individually, defendant stated that he did not want counsel and that he desired to talk with Detective Clayton. Defendant also executed a written waiver of his rights. Defendant then provided an inculpatory statement in which he admitted taking Pence's car and beating him.

Defendant argues that this statement was inadmissible because it was taken in violation of his right to counsel under both the Fifth and Sixth Amendments to the United States Constitution and under Article I, Sections 19, 23, and 27 of the North Carolina Constitution. Although defendant was unrepresented and did not ask for counsel when advised of his rights on 24 August 1995, counsel had been appointed in New Hanover County when defendant made his 25 August 1995 statement in Durham County. Accordingly, for this analysis, we will assume that defendant invoked his right to counsel for all purposes when an attorney was appointed.

As to defendant's rights under the Fifth Amendment, because counsel had been appointed, any subsequent statement resulting from interrogation initiated by law enforcement investigators would be inadmissible as a violation of his Fifth Amendment rights. *See Edwards v. Arizona*, 451 U.S. 477, 484-87, 68 L. Ed. 2d 378, 386-88 (1981). However, the record here reflects that the genesis of this statement was defendant's request to speak with the investigators on 25 August 1995. When "the accused himself initiates further communication, exchanges, or conversations with the police," a represented defendant may waive his or her Fifth Amendment right to counsel. *Id.* at 485, 68 L. Ed. 2d at 386. *See also Patterson v. Illinois*, 487 U.S. 285, 291, 101 L. Ed. 2d 261, 271 (1988). Therefore, we conclude that the investigators did not violate defendant's Fifth Amendment rights when they responded to his 25 August 1995 request to discuss his case.

A similar analysis applies to defendant's right to counsel under the Sixth Amendment. Although the State correctly points out that the right under this amendment is offense-specific and argues that defendant was not represented for all the crimes under investigation at the time this statement was made, we conclude that, in any event, defendant waived his Sixth Amendment right to counsel. "[N]othing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney." *Michigan v. Harvey*, 494 U.S. 344, 352, 108 L. Ed. 2d 293, 303 (1990); *see also State*

*v. Williams*, 355 N.C. at 545, 565 S.E.2d at 635. The waiver was also effective to waive defendant's rights to counsel under the North Carolina Constitution. *See State v. Palmer*, 334 N.C. 104, 109-10, 431 S.E.2d 172, 175 (1993). Accordingly, we hold that defendant's statement to investigators made on 25 August 1995 was properly admitted into evidence.

Defendant's third statement was made on 17 October 1995. The record reflects that when defendant made his first appearance in District Court, Durham County, on 28 August 1995, new counsel were appointed. Between that date and 17 October 1995, defendant made several attempts to contact investigators. On 17 October 1995, Detective Clayton met defendant at a magistrate's office to serve indictments on him. Because of the number of calls he had received from defendant, Detective Clayton brought Detective Gordon along as a witness. Defendant told Detective Clayton that he wanted to talk about Melanie Gray. When Detective Clayton responded that defendant "would have to speak to his attorneys," defendant asked if he "could ignore his attorney's advice and talk to [Detective Clayton] anyway." Detective Clayton told defendant that it was up to him, and defendant said that he wanted to talk to the detectives. As defendant executed a new waiver of rights, one of the investigators reminded defendant that his attorneys might be angry with him for making a statement. Defendant said he understood, but declined the offer to call counsel. Defendant then provided a statement that was substantially consistent with the statements he had given earlier. Because defendant initiated this conference, he knowingly waived his Fifth and Sixth Amendment rights to counsel when he gave this statement. *See, e.g., Michigan v. Harvey*, 494 U.S. at 352, 108 L. Ed. 2d at 303; *State v. Williams*, 355 N.C. at 545, 565 S.E.2d at 635. Accordingly, defendant's 17 October 1995 statement was properly admitted into evidence. This assignment of error is overruled.

### III. Jury Instructions

[4] Defendant next claims that the trial court erred in its instructions to the jury pertaining to the meaning of a life sentence. During the sentencing proceeding, the prosecutor's cross-examination of one of defendant's expert witnesses elicited testimony that defendant believed he might be paroled if he received a life sentence. When the court later instructed the jury, it began by stating that "[i]f you unanimously recommend a sentence of life imprisonment, the Court will impose a sentence of life imprisonment without parole." At least twice more in the instructions, the court specifically referred to "life

imprisonment without parole." However, during its deliberations, the jury sent out a note asking, "Please define life imprisonment for us." After discussing with counsel the various ramifications of this inquiry, including the governor's pardon power and whether the jury was indirectly asking whether defendant could be paroled, the court gave the jury the following instruction:

> In considering whether to recommend death or life imprisonment, you should determine the question as though life imprisonment means exactly what the statute says: "Imprisonment in the state's prison for life without parole." You should decide the question of punishment according to the issues submitted to you by the Court, wholly uninfluenced by consideration of what another arm of the government might or might not do in the future.

Shortly thereafter the jury returned with its sentencing recommendation of death.

Pursuant to N.C.G.S. § 14-17, first-degree murder is punishable by death "or imprisonment in the State's prison for life without parole." N.C.G.S. § 14-17 (2003). Similarly, N.C.G.S. § 15A-1370.1 provides that "[a] prisoner serving a sentence of life imprisonment without parole shall not be eligible for parole at any time." N.C.G.S. § 15A-1370.1 (2003). In accordance with these statutes, the North Carolina Pattern Jury Instructions contain the following admonition to trial judges: "*NOTE WELL: Where a jury makes an inquiry about the meaning of Life Imprisonment, in those cases that the offense occurred on or after 10/1/94, the jury should be instructed as follows:* A sentence of life imprisonment means a sentence of life without parole." 1 N.C.P.I.—Crim. 150.13 (2000). Although the judge and counsel were aware of legal nuances raised by the question, the additional extraneous language that the judge inserted in the instruction to address those issues contained the ineluctable suggestion that "life without parole" was not the absolute alternative to death that the General Assembly intended jurors to consider when weighing the appropriate sentence to impose in a capital case. Accordingly, the instruction given was erroneous.

## IV. Conduct of Counsel

Finally, defendant objects to certain questions that the prosecutor asked of his mental health experts and to particular closing arguments made by the prosecutor. Because we reverse for other reasons, we need not address these issues in detail. However, we encourage

counsel to review our holdings in *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002), and *State v. Rogers*, 355 N.C. 420, 562 S.E.2d 859 (2002), prior to any retrial of this case.

NEW TRIAL.