IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-596

No. COA21-459

Filed 6 September 2022

Yadkin County, Nos. 18CRS51657; 18CRS51656

STATE OF NORTH CAROLINA

v.

MICHAEL LEONARD ADAMS, JR., and VANESSA PENA, Defendants.

Appeal by defendants from judgments entered on or about 18 March 2021 by Judge Michael D. Duncan in Superior Court, Yadkin County. Heard in the Court of Appeals 22 February 2022.

> *Attorney General Joshua H. Stein, by Assistant Attorneys General Ryan C. Zellar and Deborah M. Greene, for the State.*
>
> *Michael E. Casterline, for defendant Michael Leonard Adams, Jr.*
>
> *Gilda C. Rodriguez, for defendant Vanessa Pena.*

STROUD, Chief Judge.

¶ 1 Defendants appeal from judgments entered upon jury verdicts finding them each guilty of misdemeanor child abuse. Defendant Adams argues the trial court erred (1) by denying his motion to dismiss at the close of all evidence; (2) by denying his motion to reopen *voir dire* of a juror after that juror expressed a potential bias toward defendants who do not testify on their own behalf; and (3) by ordering him to

complete conditions of his probation while this appeal was pending. Defendant Pena presents arguments for (1) and (2) above, but does not challenge the portion of the trial court's judgment ordering her to complete conditions of her probation while this appeal was pending. We find the trial court committed no error as to Defendants' motions to dismiss or motions to reopen *voir dire* but did err by ordering Defendant Adams to complete the special conditions of his probation while his appeal was pending. The case is remanded for resentencing as to Defendant Adams only.

## I. Background

Defendants were tried on 1 May 2019 in Yadkin County District Court. Both Defendants were found guilty of misdemeanor child abuse. Both appealed to the Superior Court and were tried 15 March 2021.

During the unrecorded jury selection at the Superior Court trial, and after he had been passed upon by the State and by defense counsel for both Defendants, but before the jury was impaneled, one of the jurors, Juror Clark,[1] raised his hand and "indicated that he wanted to say something." The rest of the jurors were dismissed for the evening and Juror Clark was held back to speak to the trial court. Juror Clark told the trial court he could not hear one of the questions, and Defendant Adams's counsel repeated the question:

> The one about if they choose not to testify? Yes, sir. If --

---

[1] A pseudonym.

> the defendants have a choice not to testify in the trial. If
> they exercise that right and choose not to testify, do you
> believe that you can give the defendants a fair trial based
> on their choosing not to testify?

Juror Clark then indicated he thought both Defendants should be required to "answer the questions themselves." The trial court did not reopen *voir dire*, but examined Juror Clark regarding his opinion on the Defendants' rights not to testify, and told Juror Clark he "cannot hold that against them if they choose not to testify." After the trial court's questions and instructions, Juror Clark affirmed he understood the Defendants have a right not to testify and that he could follow the law as instructed by the trial court. Counsel for both Defendants made motions to reopen *voir dire* to question Juror Clark; the trial court heard arguments and then elected to "give it some thought overnight."

¶ 4      The following morning, the trial court heard additional arguments by all parties and brought Juror Clark back into the courtroom for additional examination. After a lengthy instruction, and after Juror Clark again affirmatively responded that he could follow the law as instructed by the trial court, the trial court denied Defendants' motions to reopen *voir dire*.

¶ 5      The trial proceeded, and only the State presented evidence. The State's evidence tended to show at approximately 6 p.m. on 21 September 2018 Detective Ryan Preslar with the Yadkinville Police Department was "walking out of the police

department to go home" when he heard "screaming and hollering." He "walked out to the parking lot to look, and . . . [saw] a man in the back driver's side door" of a vehicle across the street, "behind the driver's seat, half his body [was] in the car and he [was] coming in and out." Detective Preslar testified "[i]t was hard to tell . . . if he was hitting somebody or jerking on something." The vehicle was in the Sheriff's Office parking lot, across the street from the Yadkinville Police Department parking lot.

¶ 6        Detective Preslar radioed for help and ran toward the vehicle. As he approached, he noticed "[Defendant] Adams had the child out of the vehicle. He had [his arm] wrapped kind of around [the child's] upper torso and arm and he's pulling in one direction and [Defendant] Pena had [the child] by the bottom half of his body, his legs area and she's pulling in the opposite direction." Detective Preslar testified the Defendants were "violent[ly]" pulling the child in opposite directions, because "[t]hey were both wanting that child." The child was "hollering, crying out[,]" and appeared to be in pain. The "tug of war" continued for approximately 20 to 30 seconds while Detective Preslar approached the vehicle, and "[w]hen [he] [got] within feet of [the Defendants] they let go" of the child. Defendants did not drop the child, but quickly put him down on his feet. At about this time Deputy Nathaniel Hodges from the Yadkin County Sheriff's Office arrived and the Defendants were separated. Detective Preslar did not notice injuries on either Defendant or on the child, and the child calmed down significantly after Detective Preslar separated the Defendants.

Detective Preslar noticed that the car seat in the car "was actually pulled from its strapped-in position, and it was kind of set to the side."

¶ 7        Deputy Hodges interviewed the Defendants. Defendant Adams stated "he just wanted his child, that he was there to pick up their child . . . for a child custody exchange." Defendant Adams also told Deputy Hodges he was supposed to have someone with him to supervise the child custody exchange, but he still attended the custody exchange after his mother, the usual supervisor, could not attend. Defendant Pena stated she was putting shoes on the child when "[Defendant] Adams approached the vehicle and began trying to, in her words, rip the child out of the vehicle." Defendant Pena held on to the child and the "tug of war" ensued "due to the fact she did not want [Defendant] Adams to take the child" because he was "irate." Deputy Hodges charged both Defendants with child abuse under North Carolina General Statute § 14A-318.2 and arrested both Defendants. After Defendants were arrested, DSS was contacted and took temporary custody of the child.

¶ 8        At the close of State's evidence, both Defendants made motions to dismiss. These motions were renewed at the close of all evidence. The motions were denied, and the charges were submitted to the jury. The jury returned a guilty verdict for each Defendant, and the trial court proceeded to sentencing. Both Defendants were sentenced to serve 75 days of imprisonment, suspended for 18 months of supervised probation. As one of the special conditions of probation, each Defendant was ordered

to "enroll and complete any coparenting classes." In the written judgments, the trial court noted each Defendant had entered notice of appeal in open court but ordered as to each Defendant that "probation is to commence once the appeal decision is reached but the Defendant is to enroll [and] complete the co-parenting classes while the appeal is pending." (Capitalization altered.) Both Defendants appeal.

## II. Analysis

¶ 9        Defendant Adams contends (1) the State presented insufficient evidence to convict him because the child suffered no injury and no substantial risk of injury was created by his conduct; (2) "the trial court abused its discretion when it denied [his] motion to reopen *voir dire* of Juror [Clark]," (capitalization altered), because good reason existed to reopen *voir dire*; and (3) the trial court violated North Carolina General Statute § 15A-1451(a)(4) when it ordered him to serve conditions of his probation while his appeal was pending. Defendant Pena presents substantially the same arguments for the first two issues. Defendant Adams alone asserts the trial court erred by ordering him to complete the conditions of his probation during the pendency of his appeal. Defendant Pena proposed this issue for review but did not address this error in her brief and it has been abandoned. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."). We will address each Defendant's argument regarding denial of the motions to dismiss separately. We will address their arguments regarding denial of the motion to re-

open *voir dire* together, and we will address Defendant Adams's argument regarding

the special condition of his probation last.

## A. Sufficiency of the Evidence

### 1. Standard of Review

¶ 10       This Court's standard of review of a trial court's ruling on a motion to dismiss

is well-settled:

> A trial court's denial of a defendant's motion to dismiss is reviewed *de novo. State v. Smith,* 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). On appeal, this Court must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator[.]" *State v. Fritsch,* 351 N.C. 373, 378, 526 S.E.2d 451, 455 (citation omitted), *cert. denied,* 531 U.S. 890, 121 S. Ct. 213, 148 L.Ed.2d 150 (2000).
>
> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith,* 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). Evidence must be viewed in the light most favorable to the State with every reasonable inference drawn in the State's favor. *State v. Rose,* 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied,* 515 U.S. 1135, 115 S. Ct. 2565, 132 L.Ed.2d 818 (1995). "Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal." *Smith,* 300 N.C. at 78, 265 S.E.2d at 169.

*State v. Watkins*, 247 N.C. App. 391, 394, 785 S.E.2d 175, 177 (2016). "[T]he only

question before us . . . is whether a reasonable juror *could* have concluded that the

defendant was guilty based on the evidence presented by the State. If so, even if the

case is a close one, it must be resolved by the jury." *Id.* at 396, 785 S.E.2d at 178

(emphasis in original).

### 2. Analysis

¶ 11     Both Defendants were convicted under North Carolina General Statute § 14-318.2. Section 14-318.2 provides in relevant part:

> (a) Any parent of a child less than 16 year of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means is guilty of the Class A1 misdemeanor of child abuse.

N.C. Gen. Stat. § 14-318.2 (2018). "[T]he State must introduce substantial evidence that the parent, by other than accidental means, either (1) inflicted physical injury upon the child; (2) allowed physical injury to be inflicted upon the child; or (3) created or allowed to be created a substantial risk of physical injury." *Watkins*, 247 N.C. App. at 395, 785 S.E.2d at 177. There is no dispute that Defendants are the parents of the child or that the child is less than 16 years old, and the State only sought a conviction on the substantial risk theory of misdemeanor child abuse. Therefore, the sole element of misdemeanor child abuse in dispute is whether each Defendant "creat[ed] or allow[ed] to be created a substantial risk of physical injury, upon or to such child by other than accidental means . . . ." N.C. Gen. Stat. § 14-318.2; *id.*

### a. Defendant Adams's Motion to Dismiss

¶ 12     This Court has recognized a "paucity of cases applying" the substantial risk

STATE V. ADAMS

2022-NCCOA-596

*Opinion of the Court*

prong of § 14-318.2. *See Watkins*, 247 N.C. App. at 395, 785 S.E.2d at 177-78. Because "substantial risk of physical injury" is not defined by § 14-318.2, this Court engages in a fact-specific inquiry to determine if such risk exists. *See id.* at 395-96, 785 S.E.2d 177-78. Defendant Adams argues "*State v. Watkins . . .* appears to [be] the only precedential case where a parent was convicted of child abuse without proof of some injury, but instead for merely creating a substantial risk of injury." He also argues *Watkins* is distinguishable from this case and the State has not put forth substantial evidence Defendant Adams created a substantial risk of physical injury to the child by other than accidental means. He argues that the short duration of the incident cuts against any finding of a substantial risk. We hold there was sufficient evidence to submit the case to the jury, and the trial court did not err in denying Defendant Adams's motion.

¶ 13    Defendant Adams appears to be correct that *Watkins* is the sole reported case applying the "substantial risk" prong of § 14-318.2. In *Watkins*, the defendant parked her car outside the Madison County Sheriff's Office and left her 19-month-old son buckled in his car seat while she went inside the Sheriff's Office to leave money for an inmate in the jail. *Id.* at 392, 785 S.E.2d at 176. The State's evidence showed when she was in the lobby, she could not see her car, which was parked about 46 feet away from the front door. *Id.* A detective escorted the defendant out after she argued with employees in the lobby and saw the child in the car. *Id.* at 392-393, 785 S.E.2d

at 176.

¶ 14    The defendant in *Watkins* testified in her own defense. *Id.* at 393, 785 S.E.2d at 176. She testified the child was very warmly dressed in a "snowsuit . . . mittens, boots, a toboggan, pants, and a sweater." *Id.* She said the car had been running before she arrived at the Sheriff's Office with the heater on, and the car was "hotter than blazes" when she got out. *Id.* She claimed she left the windows closed when she went inside the Sheriff's Office, where she believed, based on past experience, it would only take "'three or four minutes' to purchase [a] calling card." *Id.* at 393, 785 S.E.2d at 177. She also claimed she could see the car from where she was standing in the lobby. *Id.*

¶ 15    The *Watkins* Court, viewing the evidence in the light most favorable to the State, analyzed the evidence as to substantial risk of physical injury in these circumstances:

> Here, viewing the evidence, as we must, in the light most favorable to the State with every inference drawn in the State's favor, James, who was under two years old, was left alone and helpless—outside of Defendant's line of sight— for over six minutes inside a vehicle with one of its windows rolled more than halfway down in 18–degree weather with accompanying sleet, snow, and wind. Given the harsh weather conditions, James' young age, and the danger of him being abducted (or of physical harm being inflicted upon him) due to the window being open more than halfway, we believe a reasonable juror could have found that Defendant "created a substantial risk of physical injury" to him by other than accidental means. *See* N.C.

Gen. Stat. § 14–318.2(a).

*Id.* at 395-96, 785 S.E.2d at 178.

¶ 16 In addition to *Watkins*, Defendant Adams argues several unreported cases from this Court are persuasive, even if they are not binding precedent, and they illustrate what constitutes a "substantial risk of physical injury" in violation of § 14-318.2. *See, e.g.*, *State v. Parker*, 278 N.C. App. 606, 2021-NCCOA-389, ¶ 24 (unpublished) ("[D]riving at sixty (60) miles per hour with a car door open creates a 'substantial risk of injury' for any passengers, including children, in the vehicle."); *State v. Miller*, 276 N.C. App. 276, 2021-NCCOA-84, ¶ 16 (unpublished) (Where defendant "'exceeded the speed limit for approximately one minute' before 'sometimes crossing the center line to pass pulled-over vehicles' with Deputy Rae in pursuit with his blue lights flashing"); *State v. Thomas*, 217 N.C. App. 198, 719 S.E.2d 254 (2011) (unpublished) (exposure to 41 grams of cocaine and a loaded firearm); *In re I.H.*, No. COA09-244, 2009 WL 2139096 (N.C. App. July 7, 2009) (unpublished) (high speed police chase resulting in accident where children were injured).

¶ 17 But the factual circumstances here Defendant Adams seeks to distinguish from *Watkins* and the unreported cases are instead similar in relevant ways. In all the cases, the potentially dangerous incidents were quite brief, just minutes, and in all but one case the children involved were fortunately unharmed. The question is whether the actions "created a substantial risk of physical injury" to the child by

"other than accidental means." Based upon these cases, a "substantial risk of physical injury" may arise in an incident lasting only moments, where the defendant has intentionally engaged in the activity presenting a risk of physical harm to the child and has exposed the child to the risk of injury—whether the child was exposed to illicit substances, or exposed to severe weather conditions, or risk of abduction, or in a speeding car driven in a manner creating a substantial risk of a crash. The circumstances in which a "substantial risk of physical injury" vary from case to case, based on the severity and length of the risky conduct, but presented a jury question sufficient to survive a motion to dismiss.

¶ 18        Thus, while illustrative, these cases "do not resolve the issue presently before us—that is, whether the State's evidence here was sufficient to raise a jury question regarding a violation of N.C. Gen. Stat. § 14-318.2(a) by Defendant." *Watkins*, 247 N.C. App. at 396, 785 S.E.2d at 178. Close questions are questions that must be resolved by the jury, and the question before us is "whether a reasonable juror *could* have concluded that [both] defendant[s] [were] guilty based on the evidence presented by the State." *Id.* (emphasis in original). Here, the State's evidence tended to show Defendant Adams attended the custody exchange of the parties' four-year-old son without a court-ordered supervisor. Defendant Adams then became incensed, for reasons undisclosed by the record, and attempted to forcibly remove the child from the vehicle. He grabbed the child around the child's upper torso and began to

violently pull the child out of the vehicle, which appears to have caused the child to "holler" or "cry out" in pain. Given the fact the car seat also appeared to have been "pulled from its strapped-in position[,]" a reasonable inference to be drawn from the evidence is that Defendant Adams pulled hard enough to move the car seat out while attempting to take the child. Then, for 20 to 30 seconds, Defendant Adams ignored police instructions and engaged in a "tug of war" with Defendant Pena, with the child serving as the "rope," placing the child at risk of physical injury from the fight between Defendants.

¶ 19     It is not difficult to conclude the child was at a substantial risk of being injured in many ways during the "tug of war." The evidence, viewed in the light most favorable to the State, shows that Defendant Adams "created a substantial risk of physical injury" to his child. *Watkins*, 247 N.C. App. at 395, 785 S.E.2d at 177. Many of these injuries may occur very quickly, and Defendant Adams's argument that the short duration of the incident cuts against a finding of "substantial risk of physical injury" is not persuasive. The evidence simply creates a question for the jury to resolve as to whether the duration of the incident was long enough to create a "substantial risk of physical injury." During the struggle, the child could have been dropped and suffered injury. The child could have been harmed by the mere act of pulling the child in two directions. Defendant Adams had wrapped his arm around the child's upper torso, and the child's neck or head could have been compressed or

contorted as a result of the struggle. If either parent lost their grip on the child, the child could have been thrown to the ground by the force exerted by the other parent and injured. And the record reflects that none of Defendant Adams's conduct was accidental. His attempts to wrest the child away from Defendant Pena were quite intentional, even though he did not intend to harm the child. There was no indication in *Watkins* or any of the unreported cases cited by Defendant Adams that the defendants had any intention or desire of harming the children in those situations; they intentionally engaged in risky activities in a time and manner that also placed a child at risk of injury. The State presented substantial evidence Defendant "create[d] or allow[ed] to be created a substantial risk of physical injury, upon or to [his] child by other than accidental means" in violation of North Carolina General Statute § 14-318.2. The trial court did not err by denying his motion to dismiss.

### b. *Defendant Pena's Motion to Dismiss*

¶ 20      Much of the evidence presented by the State as to Defendant Adams's culpability under § 14-318.2 is equally applicable to the prosecution of Defendant Pena. Upon a *de novo* review of the evidence presented by the State, viewed "in the light most favorable to the State[,]" *Watkins*, 247 N.C. App. at 394, 785 S.E.2d at 177 (quotation omitted), the State's evidence was sufficient to show Defendant Pena "created or allowed to be created a substantial risk of physical injury" to the child and thus must be resolved by the jury. *See id.* at 395, 785 S.E.2d at 177.

¶ 21        The State's evidence tended to show Defendant Pena was an equal participant in the "tug of war" over the Defendants' child. When Detective Preslar was approaching the vehicle in the Sheriff's Office parking lot, he observed Defendant Pena with her arms around the "[m]iddle of the [child's] legs." As Detective Preslar approached, Defendant Pena also ignored his instructions to "put the child down" and continued to pull the child in the direction opposite Defendant Adams for approximately 20 to 30 seconds. Additionally, although Defendant Adams was not seriously injured, Defendant Adams told Detective Preslar that Defendant Pena became violent in close proximity to the child during the physical struggle and "bit [Defendant Adams] on the forearm and punched him in the face several times." Detective Preslar characterized Defendant Pena as pulling on the child "hard" or "violent[ly]." Even though Defendant Adams "was supposed to be getting custody of the child that day[,]" Defendant Pena resisted a cooperative custody exchange and instead engaged in a violent physical struggle over possession of the child, starting in the confines of a vehicle.

¶ 22        Defendant Pena cites *State v. Noffsinger*, 137 N.C. App. 418, 426, 528 S.E.2d 605, 611 (2000), and argues "'a parent owes a special duty to her child which has long been recognized by statute and by common law' and that 'a parent has a duty to take affirmative action to protect her child and may be held criminally liable if she is present when someone harms her child and she does not take reasonable steps to

prevent it.'" She frames the struggle over the child as "taking affirmative action to protect her son from [Defendant] Adams, who arrived without the court ordered custody [supervisor] and forcibly removed [the child] from her car, and [to] keep [Defendant] Adams from driving away with [the child] in the erratic and dangerous state in which he was in." But Defendant Pena does not address another possible interpretation of the evidence: that even though they met in the parking lot of the Sheriff's Office (and across the street from the Police Department), where she could have quickly summoned an officer to assist if Defendant Adams was in an "erratic and dangerous" state, she instead participated in an unreasonable struggle over physical possession of the child with the child's father. Instead of seeking help, she took affirmative action that placed the child in danger by engaging in the "tug of war" over him. Regardless, even though Defendant Pena "offered an innocent explanation for [her] conduct," the State's evidence need not "'rule out every hypothesis of innocence.'" *State v. Winkler*, 368 N.C. 572, 582, 780 S.E.2d 824, 830 (2015) (quoting *State v. Thomas*, 350 N.C. 315, 343, 514 S.E.2d 486, 503 (1999)). "[A] reasonable juror *could* have concluded that the defendant was guilty based on the evidence presented by the State." *Watkins*, 247 N.C. App. at 396, 785 S.E.2d at 178 (emphasis in original).

¶ 23      The State presented substantial evidence to submit to the jury the question of whether Defendant Pena "create[d] or allow[ed] to be created a substantial risk of

physical injury, upon or to [her] child by other than accidental means" in violation of North Carolina General Statute § 14-318.2. The trial court did not err by denying Defendant Pena's motion to dismiss.

### c. *Conclusion*

¶ 24    Because the State presented substantial evidence of each element of misdemeanor child abuse, *see Watkins*, 247 N.C. App. at 394, 785 S.E.2d at 177, "a reasonable juror *could* have concluded that [both] defendant[s] [were] guilty based on the evidence presented by the State." *Id.* at 396, 785 S.E.2d at 178 (emphasis in original). The trial court did not err by denying Defendants' motions to dismiss.

## B. Defendants' Motions to Reopen *Voir Dire*

### 1. *Standard of Review*

¶ 25    "In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby." *State v. Rodriguez*, 371 N.C. 295, 312, 814 S.E.2d 11, 23-24 (2018) (quotation omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988); *see also White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) ("A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . [or] upon a showing that [the trial court's

decision] was so arbitrary that it could not have been the result of a reasoned decision.").

## 2. *Analysis*

¶ 26    All parties agree North Carolina General Statute § 15A-1214 governs jury selection. Section 15A-1214(g) provides:

> (g) If at any time after a juror has been accepted by a party, and before the jury is impaneled, it is discovered that the juror has made an incorrect statement during voir dire or that some other good reason exists:
>
> (1) The judge may examine, or permit counsel to examine, the juror to determine whether there is a basis for challenge for cause.
>
> (2) If the judge determines there is a basis for challenge for cause, he must excuse the juror or sustain any challenge for cause that has been made.
>
> (3) If the judge determines there is no basis for challenge for cause, any party who has not exhausted his peremptory challenges may challenge the juror.

N.C. Gen. Stat. § 15A-1214(g) (2018). Section 15A-1214(g) gives the court "leeway to make an initial inquiry when allegations are received before a jury has been impaneled that would, if true, establish grounds for reopening *voir dire . . . .*" *State v. Boggess*, 358 N.C. 676, 683, 600 S.E.2d 453, 457 (2004). "As part of this initial investigation, the judge may question any involved juror and may consult with counsel out of the juror's presence. Based on information thus developed, the judge has discretion to reopen *voir dire* or take other steps suggested by the circumstances."

*Id.*

¶ 27        Defendants argue there was "good reason . . . to challenge [Juror Clark] for cause or, alternatively, to exercise a peremptory challenge[.]" (Capitalization altered.) The State argues that even with good cause, "the trial court is permitted, but is not required to reopen *voir dire.*" The trial court did not abuse its discretion, and Defendants' arguments are overruled.

¶ 28        Here, the trial court questioned Juror Clark after he offered his opinion that he thought Defendants should "answer the questions themselves." The trial court sought to clarify Juror Clark's opinion, then carefully instructed him "that [the Defendants] have a right to testify if they wish and they have a right not to testify if they wish, and you cannot hold that against them if they choose not to testify." The trial court stretched this examination over two days, allowing Juror Clark to think on his opinion overnight before reexamining him the next morning. The trial court also heard arguments from counsel on both days. The trial court "ha[d] discretion to reopen *voir dire* or take other steps suggested by the circumstances[]" after its initial inquiry, *Boggess*, 358 N.C. at 683, 600 S.E.2d at 457, and ultimately chose to question Juror Clark without reopening *voir dire.*

¶ 29        Both Defendants cite our decision in *Bond*. *See State v. Bond*, 345 N.C. 1, 478 S.E.2d 163 (1996). They argue a juror's equivocal statements as to the death penalty qualify as "good reason" to reopen *voir dire*, as were the juror's statements in *Bond*,

*see id.* at 20, 478 S.E.2d at 172, and Juror Clark's statement here is a similarly "good reason" to reopen *voir dire*. But *Bond* is distinguishable. In *Bond*, the trial court reopened the prosecution's *voir dire* after the juror appeared to have changed his mind regarding the death penalty between the State's and the defense's *voir dire*. *Id.* at 18-19, 478 S.E.2d at 171-72. *Voir dire* was still ongoing at the time of the trial court's ruling, and the juror had not yet been passed upon by both the prosecution and the defense. *Id.* Here, as far as the record reflects, Juror Clark did not make equivocal statements until after jury selection was completed.[2] Juror Clark made a single statement after both parties had passed on him and he had been seated in seat 2. *Bond* is not controlling. But, more importantly, even if equivocal statements like those by the juror in *Bond* or Juror Clark's statements volunteering an opinion can constitute "good cause" to reopen *voir dire*, the decision to reopen *voir dire* is still squarely within the discretion of the trial court. *See* N.C. Gen. Stat. § 15A-1214(g); *Rodriguez*, 371 N.C. at 312, 814 S.E.2d at 23-24; *see also Bond*, 345 N.C. at 19-20, 478 S.E.2d at 172 ("This Court has previously interpreted the language of N.C.G.S. § 15A-1214(g) and found that the decision to reopen *voir dire* rests in the trial court's discretion. . . . [A]bsent a showing of abuse of discretion, the trial court's decision to reopen the examination of prospective juror Robbins will not be disturbed."). We

---

[2] Because jury selection was unrecorded, our record is limited to statements made after *voir dire*, but there is no contention the issue arose earlier.

must still review the trial court's decision not to reopen *voir dire* for an abuse of discretion.

¶ 30    After examination of Juror Clark on the first day, the court expressed concerns about reopening *voir dire*:

> We've already passed on jurors. If you didn't ask them that question, you know that -- it concerns me obviously that you're going to have other jurors stepping up saying the same thing. That's the attorneys' responsibility from both sides to ask what questions they feel are necessary to get a picture of whether or not, in their own mindset a juror can be fair and impartial to both sides.
>
> I have great concerns about just starting back again with number two, and then even greater concerns if we were to do that in front of all the other jurors. It just opens a Pandora's box, and I'm not going to allow that to happen. I'll hear any further arguments in the morning if you want to go get me some case law or if you want to do a little research and you feel like you need to do a brief, any of those things are acceptable to the court.

The trial court reasoned that reopening *voir dire* would have a negative impact on the orderly disposition of Defendants' charges, possibly resulting in a lengthy delay, and instead opted to perform the extensive examination of Juror Clark, giving him overnight to continue to consider the trial court's instructions, to determine if his opinion would prevent him from serving as a fair and impartial juror. The trial court also allowed parties an additional opportunity to develop their arguments and be heard the next day. At the end of the first day, the trial court did not doubt Juror

Clark's ability to remain fair and impartial:

> The Court was satisfied when [Juror Clark] left yesterday
> that regardless of how he felt about the law, whether he
> liked it or disliked it, that he indicated that he would follow
> and obey the law as the Court instructed him.

And, after hearing additional arguments from counsel the next day, the trial court was still "satisfied with the answer of [Juror Clark]" and denied both Defendants' motions.

¶ 31    "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . [or] upon a showing that [the trial court's decision] was so arbitrary that it could not have been the result of a reasoned decision." *White*, 312 N.C. at 777, 324 S.E.2d at 833. The trial court in this case denied Defendants' motions after inquiring into Juror Clark's opinion and only after determining Juror Clark would be able to follow the law. Defendants' motions were denied because the trial court was concerned that reopening *voir dire* would "open[] a Pandora's box" and cause delays during Defendants' trial, Defense counsel for both parties had already passed on Juror Clark, and Juror Clark gave repeated affirmations that he understood and could apply the law. The trial court came to "a reasoned decision" when it denied Defendants' motions. *Id.*

¶ 32    We do not need to reach Defendants' alternative argument that, "if *voir dire* of [Juror Clark] had been reopened and the trial court did not dismiss him for cause,

[Defendants] could have used a peremptory challenge to remove him[,]" because the trial court did not abuse its discretion by refusing to reopen *voir dire*. *See* N.C. Gen. Stat. § 15A-1214(c)-(f) (2021) (establishing that peremptory challenges may only be exercised while *voir dire* is open). Because the trial court did not abuse its discretion by denying Defendants' motions after examining Juror Clark without reopening *voir dire*, the trial court committed no error and did not violate § 15A-1214(g).

**C. Defendant Adams's Conditions of Probation**

¶ 33     "An alleged error in statutory interpretation is an error of law, and thus our standard of review for this question is *de novo*." *State v. Skipper*, 214 N.C. App. 556, 557, 715 S.E.2d 271, 272 (2011) (quoting *Armstrong v. N.C. State Bd. of Dental Examiners*, 129 N.C. App. 153, 156, 499 S.E.2d 462, 466 (1998)).

¶ 34     Defendant Adams asserts the trial judge violated North Carolina General Statute § 15A-1451(a)(4) by "order[ing] him to enroll in co-parenting classes and serve the active portion of his split sentence before the appeal was decided." The State concedes that this was an error. After a review of the judgment, we agree the trial court did err by ordering Defendant Adams to fulfill conditions of his probation while his appeal was pending. Although the trial court's judgment is identical as to Defendant Pena, she failed to argue this issue on appeal and it has been abandoned. *See* N.C. R. App. P. 28(a).

¶ 35     North Carolina General Statute § 15A-1451(a)(4) provides: "(a) When a

defendant has given notice of appeal: . . . (4) Probation or special probation is stayed."
N.C. Gen. Stat. § 15A-1451(a)(4) (2018). Defendant Adams gave notice of appeal in open court after the trial court suspended his sentence and ordered the co-parenting classes as conditions of probation. Then, the trial court included the following in its written judgment: "Probation is to commence once the appeal decision is reached *but the Defendant is to enroll* [*and*] *complete the co-parenting classes while the appeal is pending . . . ."* (Capitalization altered and emphasis added.) Because Defendant Adams's probation was stayed by North Carolina General Statute § 15A-1451 upon his notice of appeal, the trial court erred when it ordered Defendant Adams to complete conditions of his probation while his appeal was pending. We remand for resentencing.

## III.    Conclusion

¶ 36    We conclude the trial court did not err by denying Defendants' motions to dismiss and motions to reopen *voir dire* of Juror Clark. We also conclude the trial court erred by ordering Defendant Adams to complete his probation while his appeal was pending. The case is remanded for resentencing as to Defendant Adams only.

NO ERROR IN PART; REMANDED IN PART.

Judges ARROWOOD and WOOD concur.